## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| LUCID ALTERNATIVE FUND, LP, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> ELASTIC N.V., ASHUTOSH KULKARNI, and JANESH MOORJANI, <br><br> Defendants. | Case No. <br><br> **CLASS ACTION COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

Plaintiff Lucid Alternative Fund, LP ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Elastic N.V. ("Elastic" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

### NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired Elastic securities between

May 31, 2024 and August 29, 2024, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.      Elastic describes itself as "the Search AI [artificial intelligence] Company[.]"  Its platform, available as both a hosted, managed service via cloud servers and self-managed software, purportedly allows customers to find insights and drive AI and machine learning use cases from large amounts of data, with solutions separated into three categories: Search, Observability, and Security.

3.      Elastic's sales teams are organized primarily by geography and secondarily by customer segments.  The Company offers its products and services to both the private and public sectors in the Americas and internationally, including in Europe, the Middle East and Africa ("EMEA").

4.      Elastic's Americas business has consistently accounted for the largest proportion of the Company's revenue, with the U.S. alone accounting for approximately $730.488 million, or nearly 58%, of Elastic's total approximate $1.267 billion in revenue earned in its fiscal year ("FY") 2024.  Likewise, the U.S. alone accounted for nearly 59% and 56% of the Company's total revenue earned in its FYs 2023 and 2022, respectively.

5.      On May 30, 2024, during after-market hours, Elastic issued a press release announcing its fourth quarter and FY 2024 financial results.[1]  That press release provided financial guidance for the Company's FY 2025, including, *inter alia*, revenue of $1.468 billion to $1.48 billion, representing 16% year-over-year growth at the midpoint.

---

[1] Elastic's FY ends on April 30.

6.     Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operations, and prospects.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Elastic had implemented significant changes to its sales operations, particularly with respect to its customer segments in the Americas; (ii) the foregoing changes were likely to, and did, disrupt Elastic's sales operations during the first quarter of its FY 2025; (iii) accordingly, Defendants had overstated the stability of Elastic's sales operations; (iv) as a result of all the foregoing, Elastic was unlikely to meet its own previously issued revenue guidance for its FY 2025; and (v) as a result, Defendants' public statements were materially false and misleading at all relevant times.

7.     On August 29, 2024, during after-market hours, Elastic issued a press release announcing its financial results for the first quarter of its FY 2025.  Therein, Defendants disclosed that they had slashed the Company's FY 2025 revenue guidance to a range of $1.436 billion to $1.444 billion, representing 14% year-over-year growth at the midpoint—significantly down from their prior FY 2025 revenue guidance of $1.468 billion to $1.48 billion, or 16% year-over-year growth at the midpoint—citing "a slower start to the year with the volume of customer commitments impacted by segmentation changes that we made at the beginning of the year, which are taking longer than expected to settle."

8.     The same day, also during after-market hours, Defendants hosted a conference call with investors and analysts to discuss Elastic's first quarter financial results for its FY 2025.  During that call, Defendants provided more detail concerning the nature, scope, and timing of the "segmentation changes" that had so drastically impacted Elastic's FY 2025 revenue guidance.  In particular, Defendants disclosed, *inter alia*, that they had "created more focus on selling into our largest accounts by reducing the number of accounts per sales rep and created distinct greenfield

territories to focus on landing new customers, both in the enterprise and commercial segments";
that they had implemented these changes too suddenly; that these changes had impacted "all
verticals" and "pretty much all [of] the [Company's] teams" in the Americas, apart from the U.S.
public sector; that they had been aware of these changes when they issued their initial FY 2025
revenue guidance at the beginning of the Class Period; and that they had implemented these
changes at the beginning of May 2024, *i.e.*, before the start of the Class Period.

9.      Following these disclosures, Elastic's ordinary share price fell $27.45 per share, or
26.49%, to close at $76.19 per share on August 30, 2024.

10.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline
in the market value of the Company's securities, Plaintiff and other Class members have suffered
significant losses and damages.

## JURISDICTION AND VENUE

11.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of
the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the
SEC (17 C.F.R. § 240.10b-5).

12.     This Court has jurisdiction over the subject matter of this action pursuant to 28
U.S.C. § 1331 and Section 27 of the Exchange Act.

13.     Venue is proper in this District pursuant to Section 27 of the Exchange Act (15
U.S.C. § 78aa) and 28 U.S.C. § 1391(b).  According to Elastic's most recent quarterly report on
Form 10-Q, as of November 18, 2024, there were over 103 million of the Company's ordinary
shares outstanding.  Elastic's ordinary shares trade in the U.S. on the New York Stock Exchange
("NYSE") under the ticker symbol "ESTC."  Accordingly, there are presumably hundreds, if not

thousands, of investors in Elastic securities located in the U.S., some of whom undoubtedly reside in this District.

14.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

**PARTIES**

15.     Plaintiff, as set forth in the attached Certification, acquired Elastic securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

16.     Defendant Elastic is organized under the laws of the Netherlands.  According to Elastic, because it is a distributed company,[2] it does not have a principal executive office.  Elastic's ordinary shares trade in an efficient market on the NYSE under the ticker symbol "ESTC."

17.     Defendant Ashutosh Kulkarni ("Kulkarni") has served as Elastic's Chief Executive Officer and a Director of the Company at all relevant times.  During the Class Period, Defendant Kulkarni sold 28,483 Elastic ordinary shares for total proceeds of over $3 million.

18.     Defendant Janesh Moorjani ("Moorjani") served as Elastic's Chief Financial Officer and Chief Operating Officer at all relevant times.  During the Class Period, Defendant Moorjani sold 10,011 Elastic ordinary shares for total proceeds of over $1 million.

19.     Defendants Kulkarni and Moorjani are collectively referred to herein as the "Individual Defendants."

---

[2] A distributed company typically has no central headquarters, and its workforce can be spread across different countries and locations, usually working remotely.

20.     The Individual Defendants possessed the power and authority to control the contents of Elastic's SEC filings, press releases, and other market communications.  The Individual Defendants were provided with copies of Elastic's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with Elastic, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false statements and omissions pleaded herein.

21.     Elastic and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

22.     Elastic describes itself as "the Search AI Company[.]"  Its platform, available as both a hosted, managed service via cloud servers and self-managed software, purportedly allows customers to find insights and drive AI and machine learning use cases from large amounts of data, with solutions separated into three categories: Search, Observability, and Security.

23.     Elastic's sales teams are organized primarily by geography and secondarily by customer segments.  The Company offers its products and services to both the private and public sectors in the Americas and internationally, including in EMEA.

24.     Elastic's Americas business has consistently accounted for the largest proportion of the Company's revenue, with the U.S. alone accounting for approximately $730.488 million, or

nearly 58%, of Elastic's total approximate $1.267 billion in revenue earned in its FY 2024. Likewise, the U.S. alone accounted for nearly 59% and 56% of the Company's total revenue earned in its FYs 2023 and 2022, respectively.

## **Materially False and Misleading Statements Issued During the Class Period**

25.     The Class Period begins on May 31, 2024.  On May 30, 2024, during after-market hours, Elastic issued a press release announcing its financial results for its fiscal fourth quarter and FY 2024.  Therein, Defendants provided financial guidance for Elastic's FY 2025, including, *inter alia*, "[t]otal revenue . . . between $1.468 billion and $1.480 billion, representing 16% year-over-year growth at the midpoint[.]"

26.     Also on May 30, 2024, during after-market hours, Defendants hosted a conference call with investors and analysts to discuss Elastic's financial results for its fiscal fourth quarter and FY 2024 (the "4Q/FY24 Earnings Call").  In his prepared remarks during the 4Q/FY24 Earnings Call, Defendant Kulkarni touted "[t]he strong and sustained adoption we are seeing for our GenAI capabilities" and "the consistent way we have executed on our strategy while managing the business with discipline[,]" all of which indicated to investors that Elastic's sales operations were working, stable, and helping the Company thrive, even though Defendants knew at the time that they had recently made significant changes that had impacted basically the Company's entire Americas sales operations, apart from those pertaining to the U.S. public sector.

27.     Similarly, during his prepared remarks on the 4Q/FY24 Earnings Call, Defendant Moorjani represented, *inter alia*, that "[o]ur strategy of focusing on customers with a higher propensity for growth is working as evidenced in our customer metrics"; that "[w]e remain prudent in the near term and assume that current business conditions will remain stable"; and that "[w]e . . . are confident in our outlook for the first quarter and fiscal year"; all of which likewise indicated

to investors that Elastic's sales operations were working, stable, and helping the Company thrive, even though Defendants knew at the time that they had recently made significant changes that had impacted basically the Company's entire Americas sales operations, apart from those pertaining to the U.S. public sector.

28.     During the question-and-answer ("Q&A") phase of the 4Q/FY24 Earnings Call, multiple analysts questioned the Individual Defendants regarding their business strategy for FY 2025, as well as whether there were any significant changes or factors that might impact Defendants' financial guidance for FY 2025.  In response, the Individual Defendants repeatedly affirmed their confidence in their financial guidance while indicating to investors that Elastic's sales operations were working, stable, and helping the Company thrive.  They also repeatedly failed to disclose that they had recently made significant changes that had impacted basically the Company's entire Americas sales operations.  For example, in response to an RBC Capital Markets analyst's question regarding, *inter alia*, "the full year growth for fiscal '25[ and] how are you kind of thinking about the progression of Elastic Cloud into this year[,]" Defendant Moorjani stated, in relevant part:

> [W]e're very confident in our outlook for this year. To start with, as I think about the overall guidance framework and philosophy, we've not changed that from prior quarters. So we continue to guide based on what we know and maintain that prudent stance. As you've seen, we initiated guide for the full year at 16% at the midpoint compared to the 19% we just reported for the full fiscal year '24.

> If I think about the breakdown of that, we expect that we will see momentum in both self-managed as well as cloud depending on customer preference. Fundamentally, when we think about the progression in each of those, that's driven by customer choice, and we think that's actually a competitive differentiator for us in terms of our ability to offer that choice.

* * *

If I think about it from a segment perspective, our sales strategy continues to be focused on the Enterprise and Commercial segments, where we are continuing to see a strong growth of cloud annual subscriptions[.]

29.    Similarly, in response to a question from a Jefferies analyst regarding whether "the 16% growth you gave for the year . . . embed[s] a little more headwind from macro and uncertainty in SMB [small to medium-sized businesses] slowdown" or whether there were "any change in assumptions or conservatism in terms of how you're setting that guide point[,]" Defendant Moorjani responded, in relevant part:

> [T]he way I'd characterize it is that we've learned over the last couple of years that when customer spending priorities are shifting, it's really important for us to stay very close to them. That's exactly what we are doing right now with our sales and customer success teams, and it's also really important that we maintain prudent in our outlook and that prudence is reflected in our guidance. So we're going to continue to monitor things carefully as we move forward, but at this point, we feel good about our outlook and we'll obviously update you as we go.

30.    Likewise, in response to a UBS analyst's questions regarding "the biggest driver of that stability you're seeing in the annual cloud business" and "the durability of that growth in annual cloud as we move into fiscal '25[,]" Defendant Moorjani stated, in relevant part:

> So fundamentally, as I think about our land and expand motion, it's been working quite nicely. We've talked over the last several quarters about the investments that we've been making to drive that and the strength of the commitments and the strength of the consolidation that we are seeing onto the Elastic platform. And that's all been playing out quite nicely.
>
> We obviously had a strong finish here in Q4 as well. And so fundamentally, those drivers continue to play out, and we are seeing strength both in the Enterprise and Commercial segments from that selling motion. And that's offset a little bit, as I mentioned, on the monthly cloud side, by some of the broader macro weakness in the SMB segment.
>
> But as we move forward into fiscal '25, we're continuing to focus our sales efforts in Enterprise and Commercial and continuing to drive those expansion plays, particularly with -- in areas like GenAI, in areas like platform consolidation and I think that's actually working quite nicely for us. So we've been pleased with the performance of cloud so far, and we're looking forward to Q1 and the rest of the year.

31.     Moreover, when an Oppenheimer analyst asked whether Defendants are "reorienting either product go-to-market, pricing anything internally to try and capitalize on what could be a very big displacement opportunity over the next 12 months, 24 months[,]" Defendant Kulkarni merely recounted Elastic's product advantages while omitting Defendants' overhaul of the Company's Americas sales operations.  When the same analyst pressed Defendant Kulkarni to "elaborate on the go-to-market side" "[b]ecause what you've described is a lot of product enhancements and benefits," he merely responded:

> Yes, look, we got out of our sales kickoff just a couple of weeks ago, and this is one of the area[s] that our sales teams are most excited about. So we have clear campaigns that are going after this opportunity as you can imagine. And literally, the way we talk to our sales team is the two questions that we need to be asking is, one, what vector database are you using to every customer? That's the question that we should be asking.
>
> And the second, are you using any of these incumbent security or log analytics technologies that haven't been delivering value, haven't been innovating? ***And we are seeing success with that motion.*** So it is absolutely a big go-to-market focus for us and the discipline and just the up-leveling of everything that Mark Dodds, our CRO [Chief Revenue Officer], is doing is just something I'm very excited about.

(Emphasis added.)

32.     On June 14, 2024, Elastic filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operating results for its fiscal fourth quarter and year ended April 30, 2024 (the "2024 10-K").  In the section of the 2024 10-K dedicated to describing Elastic's sales and marketing operations, rather than disclosing Defendants' recent overhaul of the Company's Americas sales operations, the 2024 10-K indicated to investors that Elastic's sales operations were working, stable, and helping the Company thrive, stating:

**Sales and Marketing**

We make it easy for users to begin using our products in order to drive rapid adoption. Users can either sign up for a free trial on Elastic Cloud or download our

software directly from our website without any sales interaction, and immediately begin using the full set of features. Users can also sign up for Elastic Cloud through public cloud marketplaces.

With our business model, where users can download and use many of our features free of charge, our sales prospects are often already familiar with or using our platform. We conduct low-touch campaigns to keep users and customers engaged once they have begun using Elastic Cloud or have downloaded our software. This process includes providing high-quality content, documentation, webinars, videos, and blogs through our website. We also drive high-touch engagement with qualified prospects and customers to drive further awareness, adoption, and expansion of our products with paid subscriptions. The majority of our new customers use Elastic Cloud. Many of these customers start with limited initial spending on our products but can significantly increase their spending over time.

Our sales teams are organized primarily by geography and secondarily by customer segments. We rely on inside sales development representatives to qualify leads based on the likelihood they will result in a purchase. We pursue sales opportunities both through our direct sales force and with the assistance of our partners, including through cloud marketplaces. Our relationships within customer organizations often extend beyond the initial users of the technology and include technology and business decision-makers at various levels. We also engage with our customers on an ongoing basis through a customer success team, to ensure customer satisfaction and expand their use of our technology.

33.     Appended as exhibits to the 2024 10-K were signed certifications pursuant to the Sarbanes-Oxley Act of 2002, wherein the Individual Defendants certified that the 2024 10-K "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;" and that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the [Company] as of, and for, the periods presented in this report[.]"

34.     The statements referenced in ¶¶ 25-33 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants made

false and/or misleading statements and/or failed to disclose that: (i) Elastic had implemented significant changes to its sales operations, particularly with respect to its customer segments in the Americas; (ii) the foregoing changes were likely to, and did, disrupt Elastic's sales operations during the first quarter of its FY 2025; (iii) accordingly, Defendants had overstated the stability of Elastic's sales operations; (iv) as a result of all the foregoing, Elastic was unlikely to meet its own previously issued revenue guidance for its FY 2025; and (v) as a result, Defendants' public statements were materially false and misleading at all relevant times.

35.    In addition, throughout the Class Period, Elastic's periodic financial filings were required to disclose the adverse facts and circumstances detailed above under applicable SEC rules and regulations.  Specifically, Item 105 of SEC Regulation S-K, 17 CFR § 229.105 ("Item 105"), required Elastic to "provide under the caption 'Risk Factors' a discussion of the material factors that make an investment in the [Company] or offering speculative or risky" and "[c]oncisely explain how each risk affects the [Company] or the securities being offered."  Defendants' failures to disclose, *inter alia*, that Elastic had implemented significant changes to its sales operations, particularly with respect to its customer segments in the Americas; that the foregoing changes were likely to, and did, disrupt Elastic's sales operations during the first quarter of its FY 2025; and that, as a result, Elastic was unlikely to meet its own previously issued revenue  guidance for its FY 2025; violated Item 105 because these issues represented material factors that made an investment in the Company speculative or risky.

36.    Defendants also violated Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303(b)(2)(ii) ("Item 303"), which required Elastic to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  Defendants' failures to

disclose, *inter alia*, that Elastic had implemented significant changes to its sales operations, particularly with respect to its customer segments in the Americas; that the foregoing changes were likely to, and did, disrupt Elastic's sales operations during the first quarter of its FY 2025; and that, as a result, Elastic was unlikely to meet its own previously issued revenue guidance for its FY 2025; violated Item 303 because these issues represented known trends or uncertainties that were likely to have a material unfavorable impact on the Company's business and financial results.

### The Truth Emerges

37.     On August 29, 2024, during after-market hours, Elastic issued a press release announcing its financial results for the first quarter of its FY 2025 (the "1Q25 Earnings Release"). Therein, Defendants disclosed that they had slashed the Company's FY 2025 revenue guidance to a range of $1.436 billion to $1.444 billion, representing 14% year-over-year growth at the midpoint—significantly down from their prior FY 2025 revenue guidance of $1.468 billion to $1.48 billion, or 16% year-over-year growth at the midpoint. In addressing the Company's significantly reduced FY 2025 revenue guidance, the 1Q25 Earnings Release quoted Defendant Kulkarni as stating, in relevant part:

> [W]e had a slower start to the year with the volume of customer commitments impacted by segmentation changes that we made at the beginning of the year, which are taking longer than expected to settle. We have been taking steps to address this, but it will impact our revenue this year[.]

38.     The same day, also during after-market hours, Defendants hosted a conference call with investors and analysts to discuss Elastic's financial results for the first quarter of its FY 2025 (the "1Q25 Earnings Call"). During his prepared remarks on the 1Q25 Earnings Call, Defendant Kulkarni provided further detail regarding the "sales segmentation changes" that Defendants had made at the beginning of the quarter, stating, in relevant part:

In terms of the issues that affected the total customer commitments closed in Q1, we were impacted by sales segmentation changes we made at the beginning of Q1 to increase focus on our strategic enterprise and high-potential mid-market customers.

To be more specific, at the start of the fiscal year, we expanded our strategic segment, created more focus on selling into our largest accounts by reducing the number of accounts per sales rep and created distinct greenfield territories to focus on landing new customers, both in the enterprise and commercial segments.

\* \* \*

[W]e underestimated the impact of the account transitions that occurred with these changes. This was especially true in the Americas where we had the largest territory changes and we just didn't progress deals fast enough to bring them over the finish line.

39.     Also during his prepared remarks on the 1Q25 Earnings Call, Defendant Moorjani disclosed, in relevant part:

To add more context around deal flow during the quarter, we did not close deals to the extent we expected. This was mainly due to account transitions caused by the segmentation changes we intentionally made in our sales organization, particularly in the Americas, and to a lesser extent, tighter budget constraints that we did not anticipate in EMEA.

Since our contract signings tend to be back-end loaded in the quarter, these issues became more visible to us in July.

\* \* \*

The shortfall on customer commitments in Q1 will directly impact both self-managed and Elastic Cloud revenue this fiscal year.

40.     During the Q&A phase of the 1Q25 Earnings Call, after multiple analysts pressed the Individual Defendants for further clarification on the circumstances surrounding the "segmentation changes" that had so drastically impacted Defendants' revenue guidance for FY 2025, the Individual Defendants made additional disclosures regarding the nature, scope, and timing of these changes.  For example, a Jefferies analyst asked "to hear more about the segmentation changes" and inquired about the "percent of [Elastic's] go-to-market team [that

Defendants] changed out[.]"  Defendant Kulkarni replied that "the impact was the greatest . . . in the Americas *in all verticals* except US public sector" and that, "outside of that [sector] in the Americas, *pretty much all the teams were affected*."  (Emphases added.)  Defendant Kulkarni also acknowledged that Defendants had implemented these changes too suddenly, stating: "What we got wrong was the execution of those account transitions. And if I were to redo this, I would stagger those changes a little more and do them a little more gradually."

41.    In a follow-up inquiry, the same analyst questioned "why wasn't there a higher-level of cushion embedded in the guide to ensure that you gave your guys -- you gave yourself some more room."  In response, Defendant Kulkarni revealed that Defendants had, in fact, been aware of these segmentation changes when they issued their initial FY 2025 revenue guidance at the beginning of the Class Period, stating, in relevant part:

> As we built the guide and thought about the approach and the guidance assumptions, *we anticipated some degree of change associated with this.* And look . . . segmentation changes happen as almost a standard practice in almost every enterprise software company. ***The magnitude of what we did obviously was much larger. And we <u>did</u> factor that into a degree as we built the guidance. We anticipated some of that.*** But a lot of the impact that we saw was really late in the quarter. We saw it only in the month of July and it was a little bit too late to try and recover from that there in Q1.

(Emphases added.)

42.    Separately, in response to a Needham & Company analyst's question about the timing of the segmentation changes, Defendant Kulkarni clarified that these changes were implemented at the beginning of May 2024: "[T]he segmentation changes . . . were made at the beginning of the fiscal year. So this was on May 1st that all of the changes were rolled out."

43.    In response to a Citi analyst's question regarding the impact of the segmentation changes on Defendants' revised FY 2025 revenue guidance, Defendant Moorjani revealed that

these changes had a "broad-based" impact on the Company's business and would take "a couple

of quarters to work through[,]" stating, in relevant part:

> [I]n terms of where we saw the impact, ***it was not only in the large enterprise
> accounts***, because as part of all the segmentation changes . . . ***we made changes
> across the entire Americas team except public sector. So that impacted a number
> of commercial accounts and relationships and there were changes there too. So
> it was more broad-based*** . . . . I think it was really the additional workloads, either
> net-new workloads that rep was trying to drive in existing accounts or net-new
> accounts that we were trying to land, that's where we saw a little bit more of the
> impact . . . . ***Our sales execution issues are going to take us a couple of quarters
> to work through.*** And so you won't see that addition to the pool in the form of new
> and expanded commitments at the same rate at which we've historically seen. And
> then that limits the amount of burndown that you can have and therefore limits the
> cloud revenue.

(Emphases added.)

44.     Likewise, in response to a Wells Fargo analyst's inquiry regarding "the magnitude

of the deals that slipped out of the quarter" because of Defendants' changes to Elastic's sales

operations, Defendant Moorjani acknowledged:

> I'll just say it was significant, as you can see that it obviously caused us to move
> the revenue amount here quite meaningfully. And while these deals are progressing
> nicely through the sales funnel, I would not expect all of them to close in Q2. Many
> of these will take a while to close out. And we're also continuing to work through
> the corrective actions . . . . As we said, it will take a couple of quarters for us to get
> back to a stronger level of execution that we've seen in the past.

45.     Following the 1Q25 Earnings Release and 1Q25 Earnings Call, Elastic's ordinary

share price fell $27.45 per share, or 26.49%, to close at $76.19 per share on August 30, 2024.

46.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline

in the market value of the Company's securities, Plaintiff and other Class members have suffered

significant losses and damages.

## SCIENTER ALLEGATIONS

47. During the Class Period, Defendants had both the motive and opportunity to commit fraud. For example, during the Class Period, while disseminating the materially false and misleading statements alleged herein to maintain artificially inflated prices for Elastic securities, the Individual Defendants enriched themselves by millions of dollars by engaging in insider sales of the Company's ordinary shares while those shares traded at artificially high prices. Specifically, during the Class Period, Defendant Kulkarni sold 28,483 shares of Elastic stock for total proceeds of over $3 million and Defendant Moorjani sold 10,011 shares of Elastic stock for total proceeds of over $1 million.

48. Defendants also had actual knowledge of the misleading nature of the statements they made, or acted in reckless disregard of the true information known to them at the time. Indeed, the Individual Defendants admitted that they had implemented the significant "segmentation changes" that had impacted all teams and verticals in the Company's Americas sales operations (apart from the U.S. public sector) before the start of the Class Period. They also acknowledged that they were aware of these changes when they issued their revenue guidance for Elastic's FY 2025 at the beginning of the Class Period. Accordingly, by failing to disclose these changes, even as they significantly impacted Elastic's Americas business, which has consistently accounted for the largest proportion of the Company's revenue, Defendants participated in a scheme to defraud and committed acts, practices, and participated in a course of business that operated as a fraud or deceit on purchasers of the Company's ordinary shares during the Class Period.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

49. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise

acquired Elastic securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

50.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Elastic securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Elastic or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

51.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

52.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

53.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Elastic;

- whether the Individual Defendants caused Elastic to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Elastic securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

54. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

55. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Elastic securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Elastic securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

56.    Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

57.    Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

58.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

59.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

60.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Elastic securities; and

(iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Elastic securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

61.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Elastic securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Elastic's finances and business prospects.

62.    By virtue of their positions at Elastic, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

63.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of Elastic, the Individual Defendants had knowledge of the details of Elastic's internal affairs.

64.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.   Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Elastic.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Elastic's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Elastic securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Elastic's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Elastic securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

65.     During the Class Period, Elastic securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Elastic securities at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Elastic securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.   The market price of Elastic securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

66.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

67.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

68.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

69.    During the Class Period, the Individual Defendants participated in the operation and management of Elastic, and conducted and participated, directly and indirectly, in the conduct of Elastic's business affairs.  Because of their senior positions, they knew the adverse non-public information about Elastic's misstatement of income and expenses and false financial statements.

70.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Elastic's financial condition and results of operations, and to correct promptly any public statements issued by Elastic which had become materially false or misleading.

71.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Elastic disseminated in the marketplace during the Class Period concerning

Elastic's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Elastic to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of Elastic within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Elastic securities.

72.    Each of the Individual Defendants, therefore, acted as a controlling person of Elastic.  By reason of their senior management positions and/or being directors of Elastic, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Elastic to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Elastic and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

73.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Elastic.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.    Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## <u>DEMAND FOR TRIAL BY JURY</u>

Plaintiff hereby demands a trial by jury.

Dated: February 11, 2025

Respectfully submitted,

POMERANTZ LLP

<u>*/s/ Jeremy A. Lieberman*</u>
Jeremy A. Lieberman
J. Alexander Hood II
James M. LoPiano
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com
ahood@pomlaw.com
jlopiano@pomlaw.com

THE LAW OFFICE OF JACOB SABO
Jacob Sabo
22a Mazzeh Street
Tel-Aviv, Israel
Telephone: (++972) 39070770

*Attorneys for Plaintiff*

## CERTIFICATION PURSUANT
## TO FEDERAL SECURITIES LAWS

1.      I, Shahar Cohen, on behalf of Lucid Alternative Fund, LP (the "Fund"), as Chief Executive Officer, with authority to bind the Fund and enter into litigation on its behalf, make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2.      I have reviewed a Complaint against Elastic N.V. ("Elastic") and authorize the filing of a comparable complaint on behalf of the Fund.

3.      The Fund did not purchase or acquire Elastic securities at the direction of plaintiffs' counsel or in order to participate in any private action arising under the Securities Act or Exchange Act.

4.      The Fund is willing to serve as a representative party on behalf of a Class of investors who purchased or otherwise acquired Elastic securities during the Class Period as specified in the Complaint, including providing testimony at deposition and trial, if necessary.  I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5.      The attached sheet lists all of the Fund's transactions in Elastic securities during the Class Period as specified in the Complaint.

6.      During the three-year period preceding the date on which this Certification is signed, the Fund has served or sought to serve as a representative party on behalf of a class under the federal securities laws in the following actions:

- *Lucid Alternative Fund, LP v. Five9, Inc. et al*, No. 5:24-cv-08725 (N.D. Cal.);
- *Lucid Alternative Fund, LP v. Aehr Test Systems, Inc. et al*, No. 3:24-cv-08683 (N.D. Cal.);
- *Lucid Alternative Fund, LP v. Innoviz Technologies Ltd. et al*, No. 1:24-cv-01971 (S.D.N.Y.); and
- *In re SolarEdge Technologies, Inc. Securities Litigation*, No. 1:23-cv-09748 (S.D.N.Y.).

7.      The Fund agrees not to accept any payment for serving as a representative party on behalf of the Class as set forth in the Complaint, beyond its pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

8.      I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

**Executed _____23.01.2025_____**
**            (Date)**

Shahar Cohen ᴸᵁᶜᴵᴰ **ALTERNATIVE**
**FUND, LP**
+972 545209400      **CO. 116445**
Lucid Alternative Management
CEO                 **CAYMAN ISLANDS**

_____
**(Signature)**

**Shahar Cohen**
**Chief Executive Officer**
**Lucid Alternative Fund, LP**

**Elastic N.V. (ESTC)**                                                                                    **Lucid Alternative Fund, LP**

**List of Purchases/Acquisitions and Sales**

| Transaction Type | Security Type | Date | Number of Shares/Unit | Price Per Share/Unit |
|---|---|---|---|---|
| Purchase/Acquisition | Common Stock | 5/31/2024 | 164 | $100.5354 |
| Purchase/Acquisition | Common Stock | 5/31/2024 | 2,000 | $105.6985 |
| Purchase/Acquisition | Common Stock | 6/3/2024 | 2,000 | $102.8000 |
| Purchase/Acquisition | Common Stock | 6/21/2024 | 2,000 | $110.0000 |
| Purchase/Acquisition | Common Stock | 6/21/2024 | 5,000 | $85.0000 |
| Purchase/Acquisition | Common Stock | 6/28/2024 | 1,500 | $115.1500 |
| Purchase/Acquisition | Common Stock | 7/18/2024 | 1,000 | $115.5400 |
| Purchase/Acquisition | Common Stock | 7/19/2024 | 2,500 | $110.0000 |
| Purchase/Acquisition | Common Stock | 7/30/2024 | 1,300 | $105.7300 |
| Purchase/Acquisition | Common Stock | 7/31/2024 | 1,751 | $106.4000 |
| Purchase/Acquisition | Common Stock | 8/2/2024 | 600 | $101.8300 |
| Purchase/Acquisition | Common Stock | 8/16/2024 | 5,500 | $95.0000 |
| Purchase/Acquisition | Common Stock | 8/21/2024 | 100 | $110.3400 |
| Purchase/Acquisition | Common Stock | 8/30/2024 | 3,600 | $105.0000 |
| Purchase/Acquisition | Common Stock | 9/3/2024 | 2,500 | $90.0000 |
| Purchase/Acquisition | Common Stock | 9/6/2024 | 1,400 | $90.0000 |
| Purchase/Acquisition | Common Stock | 9/6/2024 | 2,600 | $85.0000 |
| Purchase/Acquisition | Common Stock | 9/12/2024 | 400 | $85.0000 |
| Purchase/Acquisition | Common Stock | 9/12/2024 | 800 | $90.0000 |
| Purchase/Acquisition | Common Stock | 9/13/2024 | 300 | $90.0000 |
| Sale | Common Stock | 5/31/2024 | (1,000) | $102.0300 |
| Sale | Common Stock | 6/21/2024 | (2,000) | $115.0000 |
| Sale | Common Stock | 7/31/2024 | (600) | $110.0000 |
| Sale | Common Stock | 7/31/2024 | (261) | $111.0000 |
| Sale | Common Stock | 8/2/2024 | (600) | $101.1000 |
| Sale | Common Stock | 8/20/2024 | (1,335) | $110.3004 |
| Sale | Common Stock | 8/20/2024 | (1) | $110.4000 |
| Sale | Common Stock | 8/21/2024 | (1,200) | $110.3600 |
| Sale | Common Stock | 8/29/2024 | (5,000) | $78.3300 |
| Sale | Common Stock | 8/29/2024 | (4,100) | $78.3000 |
| Sale | Common Stock | 8/29/2024 | (1,700) | $77.9000 |
| Purchase/Acquisition | C 20240816 95 | 3/19/2024 | 25 | $15.4420 |
| Purchase/Acquisition | C 20240621 85 | 4/8/2024 | 50 | $17.6326 |
| Purchase/Acquisition | C 20240816 95 | 4/9/2024 | 30 | $13.1000 |
| Purchase/Acquisition | C 20240621 100 | 5/17/2024 | 20 | $13.4330 |
| Purchase/Acquisition | C 20240621 110 | 5/31/2024 | 35 | $2.2869 |
| Purchase/Acquisition | P 20240621 115 | 6/7/2024 | 20 | $5.7960 |
| Purchase/Acquisition | C 20240719 110 | 6/27/2024 | 25 | $7.1628 |
| Purchase/Acquisition | C 20250117 130 | 6/28/2024 | 30 | $10.7177 |
| Purchase/Acquisition | C 20250516 115 | 6/28/2024 | 1 | $22.0400 |
| Purchase/Acquisition | C 20250516 115 | 6/28/2024 | 4 | $22.0500 |
| Purchase/Acquisition | C 20250516 115 | 6/28/2024 | 1 | $22.0500 |
| Purchase/Acquisition | C 20250516 115 | 6/28/2024 | 2 | $22.0500 |
| Purchase/Acquisition | C 20250516 115 | 6/28/2024 | 1 | $22.3000 |
| Purchase/Acquisition | C 20250516 115 | 6/28/2024 | 19 | $22.3000 |
| Purchase/Acquisition | C 20250516 115 | 6/28/2024 | 1 | $22.8000 |
| Purchase/Acquisition | C 20250516 115 | 6/28/2024 | 1 | $22.8000 |
| Purchase/Acquisition | C 20250117 105 | 7/3/2024 | 20 | $22.6445 |
| Purchase/Acquisition | P 20240920 100 | 7/11/2024 | 50 | $3.4200 |
| Purchase/Acquisition | C 20240719 120 | 7/15/2024 | 20 | $2.3620 |
| Purchase/Acquisition | C 20240816 125 | 7/15/2024 | 25 | $5.1000 |
| Purchase/Acquisition | C 20240816 115 | 7/16/2024 | 20 | $7.6165 |
| Purchase/Acquisition | C 20240719 115 | 7/18/2024 | 25 | $0.3480 |
| Purchase/Acquisition | C 20240719 115 | 7/18/2024 | 15 | $0.3500 |
| Purchase/Acquisition | C 20240816 110 | 7/18/2024 | 20 | $8.6860 |
| Purchase/Acquisition | C 20241018 125 | 7/19/2024 | 20 | $6.4450 |
| Purchase/Acquisition | P 20240816 100 | 7/22/2024 | 5 | $0.6800 |
| Purchase/Acquisition | P 20240816 100 | 7/22/2024 | 30 | $0.7000 |
| Purchase/Acquisition | C 20250117 105 | 7/23/2024 | 20 | $22.6025 |

Elastic N.V. (ESTC)                                                                                      Lucid Alternative Fund, LP

### List of Purchases/Acquisitions and Sales

| Transaction Type | Security Type | Date | Number of Shares/Unit | Price Per Share/Unit |
|---|---|---|---|---|
| Purchase/Acquisition | C 20240920 115 | 7/24/2024 | 30 | $8.0967 |
| Purchase/Acquisition | C 20241115 115 | 7/30/2024 | 30 | $8.9167 |
| Purchase/Acquisition | C 20240816 115 | 8/2/2024 | 30 | $1.8400 |
| Purchase/Acquisition | P 20240816 105 | 8/2/2024 | 50 | $6.7718 |
| Purchase/Acquisition | P 20240920 115 | 8/21/2024 | 6 | $10.2550 |
| Purchase/Acquisition | P 20240920 115 | 8/26/2024 | 30 | $11.6200 |
| Purchase/Acquisition | C 20240920 110 | 8/28/2024 | 40 | $5.3080 |
| Purchase/Acquisition | C 20250117 135 | 10/16/2024 | 10 | $0.3000 |
| Purchase/Acquisition | C 20250117 180 | 12/9/2024 | 12 | $0.2000 |
| Purchase/Acquisition | C 20250117 180 | 12/10/2024 | 18 | $0.3156 |
| Purchase/Acquisition | C 20250117 135 | 12/12/2024 | 10 | $0.3940 |
| Sale | C 20240816 125 | 3/19/2024 | (25) | $4.6672 |
| Sale | C 20240621 120 | 5/31/2024 | (35) | $0.6300 |
| Sale | P 20240621 105 | 5/31/2024 | (10) | $5.0000 |
| Sale | C 20240621 100 | 5/31/2024 | (20) | $8.7005 |
| Sale | C 20240719 115 | 6/6/2024 | (20) | $3.9000 |
| Sale | P 20240624 110 | 6/7/2024 | (20) | $2.8055 |
| Sale | C 20240719 130 | 6/27/2024 | (25) | $0.5672 |
| Sale | C 20240719 120 | 6/27/2024 | (25) | $2.2912 |
| Sale | C 20250117 180 | 6/28/2024 | (30) | $2.3677 |
| Sale | C 20250516 140 | 6/28/2024 | (30) | $12.9670 |
| Sale | C 20250117 145 | 7/3/2024 | (20) | $7.0445 |
| Sale | P 20240920 90 | 7/11/2024 | (50) | $1.5200 |
| Sale | C 20240719 130 | 7/15/2024 | (20) | $0.2190 |
| Sale | C 20240816 125 | 7/16/2024 | (20) | $3.0165 |
| Sale | C 20240719 120 | 7/18/2024 | (25) | $0.0980 |
| Sale | C 20240816 125 | 7/18/2024 | (20) | $2.0860 |
| Sale | C 20241018 145 | 7/23/2024 | (20) | $3.1000 |
| Sale | C 20250117 135 | 7/23/2024 | (20) | $9.5050 |
| Sale | C 20240920 140 | 7/24/2024 | (60) | $1.9733 |
| Sale | C 20241115 155 | 7/30/2024 | (30) | $1.7167 |
| Sale | C 20240816 140 | 8/2/2024 | (30) | $0.5400 |
| Sale | C 20240816 130 | 8/2/2024 | (30) | $0.6000 |
| Sale | P 20240816 90 | 8/2/2024 | (50) | $0.7518 |
| Sale | P 20240920 105 | 8/21/2024 | (6) | $5.3550 |
| Sale | P 20240920 85 | 8/26/2024 | (30) | $1.2700 |
| Sale | P 20240920 105 | 8/26/2024 | (30) | $6.3000 |
| Sale | C 20240920 135 | 8/28/2024 | (80) | $0.7540 |
| Sale | C 20250516 115 | 10/10/2024 | (15) | $3.4000 |
| Sale | C 20250117 130 | 10/11/2024 | (30) | $0.4500 |