UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE ELASTIC N.V. SECURITIES LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br><br>ALL ACTIONS | Case No. 1:25-cv-00785-RPK-LKE<br><br>CLASS ACTION<br><br>AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br>JURY TRIAL DEMANDED |

**TABLE OF CONTENTS**

TABLE OF DEFINITIONS ........................................................................................ ii

NATURE OF THE ACTION ......................................................................................1

JURISDICTION AND VENUE ..................................................................................6

PARTIES .....................................................................................................................6

SUBSTANTIVE ALLEGATIONS .............................................................................8

I.      Factual Background ........................................................................................8

II.     Materially False and Misleading Statements Issued During the Class Period..................23

III.    Additional Allegations of Scienter...............................................................48

        A.  Defendants' Own Statements Are Indicative of Knowledge ......................................48

        B.  CW Accounts Enhance a Strong Inference of Scienter.................................................50

        C.  The Core Operations Doctrine Raises an Inference of Scienter .................................54

        D.  The Temporal Proximity and Sharp Divergence Between Defendants' Misleading Statements and the Emergence of the Truth Further Bolsters an Inference of Scienter ....................................................................................54

        E.  Post-Class Period Admissions ...................................................................56

IV.     Loss Causation ..............................................................................................57

PLAINTIFFS' CLASS ACTION ALLEGATIONS.................................................60

COUNT I (VIOLATIONS OF SECTION 10(B) OF THE EXCHANGE ACT AND RULE 10B-5 PROMULGATED THEREUNDER AGAINST ALL DEFENDANTS)......................................63

COUNT II (VIOLATIONS OF SECTION 20(A) OF THE EXCHANGE ACT AGAINST THE INDIVIDUAL DEFENDANTS) ..............................................................66

PRAYER FOR RELIEF............................................................................................67

DEMAND FOR TRIAL BY JURY ......................................................................... 67

**TABLE OF DEFINITIONS**

| Term or Acronym | Definition |
|---|---|
| AE | Account Executives. |
| AI | Artificial Intelligence. |
| Bain | Bain & Company, a consultancy hired by Elastic to study the Company's shortfalls in its sales organization and recommend changes to the sales organization. |
| CEO | Chief Executive Officer. |
| CFO | Chief Financial Officer. |
| Class | All persons and entities who purchased or otherwise acquired Elastic, N.V.'s common stock on the New York Stock Exchange or another United States trading venue between June 2, 2023 and August 29, 2024, both dates inclusive, and were damaged thereby. |
| Clari | A software tool that provides a sales organization with information about the status of sales representatives, the sales pipeline, and forecasts with real-time accuracy. |
| Class Period | June 2, 2023 to August 29, 2024, both dates inclusive. |
| Commercial (segment) | Segment within Elastic's sales organization that first appeared after the segmentation changes and corresponded to customers with the potential to spend less than $1 million. |
| Company or Elastic | Elastic N.V. |
| CRO | Chief Revenue Officer. |
| CS | Customer Success (*i.e.*, customer support). |
| CW | Confidential Witness. |
| Defendants | Ashutosh Kulkarni, Janesh Moorjani, and Elastic N.V. |
| Distributed company | A company that typically has no central headquarters, and its workforce can be spread across different countries and locations, usually working remotely. |
| Dodds | Mark Dodds, Chief Revenue Officer at Elastic as of December 11, 2023. |
| Enterprise (segment) | Segment within Elastic's sales organization that was originally responsible for selling to customers with a large number of employees (1,000 to 10,000). After the segmentation changes, Enterprise accounts corresponded to customers with the potential to spend $1 million to $4 million. |
| Exchange Act | Securities Exchange Act of 1934. |
| Form 10-K | An annual report that gives a comprehensive summary of a public company's performance that is filed with the SEC. |
| Form 10-Q | A quarterly report filed by a public company with the SEC. |

| Term or Acronym | Definition |
|---|---|
| FY | Fiscal year. Elastic's fiscal year starts on May 1 and ends on April 30 of the following calendar year. A reference to the fiscal year ending on April 30, 2022, for example, is "FY 2022." |
| Guidance | The amount of a metric (typically yearly or quarterly revenue) Elastic told investors to expect during a time frame. |
| Individual Defendants | Ashutosh Kulkarni and Janesh Moorjani. |
| Lucid | Lucid Alternative Fund, LP. |
| Mid-Market (segment) | An original segment within Elastic's sales organization responsible for selling to customers with less than 1,000 employees. The term was discontinued after the segmentation changes. |
| Milan | Jeff Milan. |
| N&E | New and Expansion rate, an internal Elastic metric that measures customer growth. |
| NYSE | New York Stock Exchange. |
| Observability | One of Elastic's three business units which the Company refers to as Search AI-powered solutions. Elastic states that the Observability solution enables unified analysis across the IT ecosystem of applications, networks, and infrastructure. |
| On Premises | Refers to a scenario in which Elastic provides its services to customers on the customers' own servers, rather than through the cloud on the servers of another company. |
| Plaintiffs | Lucid Alternative Fund, LP and Jeff Milan. |
| Pipeline | The potential sales deals that AEs are working towards closing. |
| Q1-25 Earnings Release | The press release issued by Elastic on August 29, 2024, during after-market hours announcing the Company's financial results for the first quarter of fiscal year 2025. |
| RPO | Remaining performance obligations, a metric that reflects the remaining obligations Elastic's customers owe on their existing contracts. |
| Salesforce | A database that stores and organizes customer information to help businesses manage their customer relationships, sales, and marketing efforts. |
| Search | One of Elastic's three business units which the Company refers to as Search AI-powered solutions. Also known as Elasticsearch, this solution purports to provide a powerful foundation for building search AI-powered applications. |
| SEC | United States Securities and Exchange Commission. |

| Term or Acronym | Definition |
|---|---|
| Security | One of Elastic's three business units which the Company refers to as Search AI-powered solutions. Elastic states that the security solution provides unified protection to prevent, detect, and respond to threats. |
| Segmentation changes | A reorganization of the Elastic sales organization designed to increase productivity and growth in the face of negative trends that had developed for years at the Company. |
| Strategic (segment) | Segment within Elastic's sales organization that was originally responsible for selling to customers with more than 10,000 employees. After the segmentation changes, Strategic accounts corresponded to customers with the potential to spend $5 million to $10 million. |
| Thomas | Ryan Thomas, Elastic's Vice President of Sales for the Americas. |
| Quota | A pre-defined sales target, typically set for a specific period, that a salesperson, team, or organization is expected to achieve. |

Co-Lead Plaintiffs Lucid Alternative Fund, LP ("Lucid"), and Jeff Milan ("Milan" and, together with Lucid, "Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, for their Amended Class Action Complaint ("Amended Complaint") against Defendants (defined below), allege the following based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through their attorneys, which included, among other things, a review of Defendants' public documents; conference calls and announcements made by the Defendants; United States Securities and Exchange Commission ("SEC") filings; wire and press releases published by and regarding Elastic N.V. ("Elastic" or the "Company"); analysts' reports and advisories about the Company; information obtained from interviews with knowledgeable former employees of the Company; and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## <u>NATURE OF THE ACTION</u>

1.      This is a federal securities class action on behalf of a Class consisting of all persons and entities who purchased or otherwise acquired Elastic common stock on the New York Stock Exchange ("NYSE") or another United States trading venue between June 2, 2023 and August 29, 2024, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal

1

representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

2.      From the beginning of the Class Period, Defendants concealed from investors that Elastic was falling further and further behind its internal sales goals. To investors, Elastic touted the sales force's exceptional performance; internally, Elastic's senior staff bemoaned increasing customer attrition, decreasing customer sales growth, and an underinvestment in various marketing functions that reduced its sales organization's productivity. Figuring that something must be done, no later than the end of calendar year 2023, Defendants decided to fundamentally reorganize the sales force, yet falsely told investors from February 2024 through July 2024 that Elastic had no plans to modify its sales strategy. As internal voices had told Defendants, the reorganization delayed contract signings, causing Elastic to reduce its Fiscal Year ("FY") 2025 guidance contrary to its custom of the past five years of setting deliberately low annual revenue guidance, which it then gradually raised throughout the year. Elastic's stock price fell twice: first, in announcing the financial results for the third quarter of 2024, Elastic disclosed that its performance had deteriorated along several key metrics. Second, in announcing its financial results for the first quarter of 2025, Elastic disclosed that its risky gambit to fundamentally reorganize the sales force did not work out as planned. In both cases, investors lost money as a result of Defendants' false and misleading statements and omissions of material fact.

3.      Elastic is a cybertechnology company with an open-source platform that allows businesses to structure and analyze vast quantities of unorganized data. With the advancement of Artificial Intelligence ("AI"), Elastic has also powered its platform to incorporate large language models that allow its customers to search through and engage with their data. For example, an online retailer can utilize Elastic's Search AI to provide customers with the option to search for

specific products or engage with a chatbot that helps them find exactly what they are looking for. The Company also provides observability and cybersecurity solutions that let customers troubleshoot problems and thwart cyberattacks.

4.      In the years after the Company went public, Elastic grew at a rapid clip. The Company reported revenue growth of 42% in both FY 2021 and FY 2022. But Elastic's sales soon hit a snag. Year-over-year revenue growth fell to 24% in FY 2023, declined to 19% in FY 2024, and further fell to 17% in FY 2025. FY 2026 year-over-year revenue growth is expected to be even lower than FY 2025. Because of these disappointing trends, Defendants cut a $2 billion revenue target for FY 2025 to less than $1.5 billion. The decline in revenue from the Company's cloud solutions is even more significant. After reporting a year-over-year increase of 80% in FY 2022, the year-over-year growth rate declined to 42% in FY 2023, 29% in FY 2024 and 26% in FY 2025.

5.      The reasons for all this are twofold: (1) concealed adverse trends in sales productivity, customer attrition, sales contraction and expansion, and (2) a flawed sales strategy at odds with industry standards that did not properly align sales representatives with the right kind of accounts to maximize both growth and revenue for the Company. Defendants knew that these adverse trends had developed over a period of at least three to four years before early 2024.

6.      An internal document shows that Account Executive ("AE") productivity declined by 30% because of poor sales territory design, and the New and Expansion ("N&E") rate, which measures customer growth, declined by over 35%. Customer attrition and contraction increased by 20%, and Elastic was underinvested in customer success, services and marketing. The internal document also shows that more than 60% of Elastic's sales representatives failed to meet their targets in FY 2023 and less than 30% of sales representatives were expected to achieve their goals in FY 2024. The adverse trends identified in the presentation described herein are corroborated by

3

the accounts of multiple Confidential Witnesses ("CW"), who worked at Elastic both before and during the Class Period.

7.      Two well-placed CWs (CW4 and CW3) confirm that no later than October 2023, Defendants began to overhaul the sales organization with what they called "segmentation changes" designed to increase productivity and growth to reverse the negative trends that had developed for years. CW4, who was involved in discussions about the changes, states that the changes had become concrete many months before Defendants admitted to implementing them. CW4 describes the segmentation changes made by Defendants as "draconian," and states that higher level employees in the sales organization understood that the changes would hurt sales for at least six to nine months. CW4's account is corroborated by the accounts of CW3 and CW1.

8.      Rather than disclose the adverse trends, throughout the Class Period, Defendants told investors that customer retention and expansion rates, commitments and investments in marketing were strong, sales productivity thresholds were met, and Elastic's overall sales strategy was working just fine and paying off. And rather than admit that they were reorganizing Elastic's sales force, from February 2024 through June 2024, Defendants denied that Elastic had made or would make changes to its sales strategy or sales organization. Defendants also continued to make misleading statements about customer commitments and expansion, sales execution, revenue growth and profitability.

9.      Defendants knew facts that rendered their statements false and misleading when made during the Class Period. They admitted to making the changes themselves, held themselves out to investors as knowledgeable about the misrepresented subjects, and repeatedly discussed information that either overlapped with or was related to the concealed, adverse metrics. It is also not plausible that they would not know about the reasons why the sales organization needed to be

overhauled, given the importance of the issue, and the fact that CWs discussed the changes with either an Individual Defendant or senior sales personnel, who directly reported to the Individual Defendants. After the Class Period ended, the Defendants also admitted to making the changes to improve sales productivity, pipeline creation and progression, and customer attrition and expansion metrics, effectively tying the changes to the concealed, adverse trends known for years.

10.    The truth emerged in two partial disclosures. On February 29, 2024, after the market closed, the Company announced its financial results for the third quarter of 2024. In a press release, the Company disclosed slower than expected cloud revenue growth (29%) and several other sales-related metrics that deteriorated. On this partial disclosure or the materialization of the concealed risk thereof, the price of the Company's common stock fell from $133.81 at market close on February 29, 2024 to close at $117.01 on March 1, 2024, a decline of 12.6%. The stock price continued to drop on March 4, 2024, the next trading day, closing at $108.40, down another 7.4%, as the market continued to absorb the news.

11.    On August 29, 2024, during after-market hours, Defendants admitted to making changes to the sales organization, slashed the Company's FY 2025 revenue guidance, and admitted that revenue for the rest of the year, particularly cloud-based revenue, would decline because of the segmentation changes Elastic had made. Still, Defendants never disclosed the adverse trends that were the real reason for overhauling the sales organization.

12.    On this partial disclosure or the materialization of the concealed risk thereof, the price of Elastic's common stock fell by 26.5% from $103.64 per share at closing on August 29, 2024 to close at $76.19 per share on August 30, 2024.

13.    Defendants told investors that Elastic had developed a successful sales strategy even as it went further off the tracks. Having decided that *something* must be done, Defendants

then made fundamental changes, but concealed both the failure of their sales strategy and the significant attempts they made to turn the business around. Meanwhile, Plaintiffs and other Class members suffered significant losses and damages.

## JURISDICTION AND VENUE

14.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)), and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

15.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

16.     Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b). According to Elastic's most recent annual report on Form 10-K, filed on June 10, 2025, there were over 105 million of the Company's ordinary shares outstanding as of May 31, 2025. Elastic's ordinary shares trade in the United States on the NYSE under the ticker symbol "ESTC." Accordingly, there are presumably hundreds, if not thousands, of investors in Elastic securities located in the U.S., some of whom undoubtedly reside in this District.

17.     In connection with the acts alleged in this Amended Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

18.     Plaintiffs Lucid and Milan purchased Elastic's common stock during the Class Period, and suffered damages as a result of the federal securities laws violations alleged herein.

Plaintiffs' Class Period transactions in Elastic's securities are identified in their previously signed certifications filed with the Court at ECF Nos. 13-2 and 15-5.

19.    Defendant Elastic is organized under the laws of the Netherlands. According to Elastic, because it is a distributed company,[1] it does not have a principal executive office.

20.    Defendant Ashutosh Kulkarni ("Kulkarni") has served as Elastic's Chief Executive Officer ("CEO") and a Director of the Company at all relevant times. Kulkarni works out of Elastic's San Francisco office.

21.    Defendant Janesh Moorjani ("Moorjani") served as Elastic's Chief Financial Officer ("CFO") from 2017 to December 2024, and as the Company's Chief Operating Officer from 2022 until he left the Company in December 2024. Moorjani worked out of Elastic's San Francisco office.

22.    Defendants Kulkarni and Moorjani are sometimes collectively referred to herein as the "Individual Defendants."

23.    The Individual Defendants possessed the power and authority to control, and in practice did control, the contents of Elastic's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of Elastic's SEC filings, scripts for investor conferences, and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. They also participated directly in earnings calls with investors and analysts. Because of their roles and responsibilities at Elastic, and their access to material information available to them but not to the public, the Individual Defendants knew or recklessly disregarded

---

[1] A distributed company typically has no central headquarters, and its workforce can be spread across different countries and locations, usually working remotely.

that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false and misleading statements and omissions alleged herein. The Individual Defendants signed the SEC filings and/or certified that the material facts alleged therein were true and accurate, oversaw the promulgation of the Company's financial press releases filed on SEC Forms 8-K, and, throughout the Class Period, utilized the facilities of the NYSE.

## SUBSTANTIVE ALLEGATIONS

### I.    Factual Background

#### *Company Background*

24.    Elastic is a software company that operates a platform through which businesses can search through and organize their unstructured data, including PDFs, emails, or cybersecurity logs. Over 90% of Elastic's revenue is generated from its software products. Elastic has three business units, which the Company referred to as "solutions," all of which ultimately depend on Elastic's search capabilities: Observability, Security, and Search.

25.    Elastic's Observability and Security business units help businesses search through data to determine the root causes of malfunctions, detect and address intrusions as well as improve customer satisfaction generally. The Search business unit—the Company's origin—allows customers to search through their business records using Elastic's platform. The platform is not a one-size-fits-all tool. Instead, customers use Elastic to solve specific business problems by searching through specific documents. For example, a customer might use the platform to provide customer support based on a subset of internal documents, or search through human resources documents that allows employees to access information about company policy. As Elastic's

General Manager of Enterprise Search Group Matt Riley explained in September 2022, "most search use cases ultimately need some level of customizability, they need flexibility and power."

26.     Generative AI has increased investor interest in the Search field. International Data Corporation estimated in 2024 that Search revenues would rise by 27% per year through 2028, a near tripling of market size. Search accounts for 35% of Elastic's revenues.

27.     In each of the Company's FYs 2021-2023, which run from May 1 through April 30 of the calendar year, Elastic earned at least 55-60% of its revenues in the U.S.

*Elastic's Business Model Depends on Long-Term Relationships Between Its Salespeople and Its Customers*

28.     Elastic regularly describes its business model to investors as "land and expand." Elastic "lands" clients by selling its platform for a narrow set of business purposes in one segment. With their foot in the door, Elastic's AEs are expected to increase customer spend through expansion of the customer's use of Elastic's product in the initial segment, a new segment, or through entirely new uses for the customer.

29.     Elastic earns about 70% of its revenues from clients who purchase more than $100,000 in a year. The Company employs a self-described "high touch" sales strategy with these larger customers. In contrast, no sales representatives were assigned to small accounts.

30.     Elastic prices its platform by data usage rather than by access fees. As Steve Kearns, Vice President of Product Management, explained in September 2022, this means its salespeople do not need to "educate" customers on certain specific predesigned functions. Instead, they are to ask customers "[W]hat problem were you trying to solve for your business? What opportunity do you see? And how can we help?"

31.     Thus, to boost customer usage, Elastic's AEs must be familiar not just with Elastic's products but also the customer's needs and data. As an Elastic executive explained at the Analyst

Day presentation, Elastic's sales strategies are "all around providing our teams that [customer] data set and then also the tools associated with how they can drive that [sales] motion into these customers." The salespeople must also have, the executive added, "intimacy … with [the] customers" to allow the back-and-forth discussions that help identify customer opportunities.

*Elastic's Cloud Revenue is Critical to Growth*

32.    Elastic offers its platform either on the customer's own servers ("on premises") or through cloud services like Amazon Web Services, at the customer's election. Cloud fits with Elastic's sales strategy because it is fast, easy to scale and start, and customers are increasingly transferring their data to the cloud. For these reasons, analysts and investors pay close attention to the Company's cloud-based revenues, which rose from 27% of total revenues in FY 2021 to 40% of total revenues in FY 2023.

*Elastic's Sales Growth Plummets*

33.    After the Company went public in 2018, Elastic saw explosive growth. Total revenues grew from $159.9 million for the year ending April 30, 2018, to $1.07 billion for the year ending April 30, 2023. In June 2022, Elastic announced a goal to reach $2 billion in revenues by the FY expected to end on April 30, 2025. Defendants spoke at length about the new 2025 revenue goal. Before the Class Period, Moorjani explained that a focus on growing large accounts would drive Elastic towards $2 billion in revenue.

34.    Sales growth, however, collapsed just as Defendants established the $2 billion target. After reporting year-over-year revenue growth of 42% in both FY 2021 and FY 2022, year-over-year revenue growth fell to 24% in FY 2023, further declined to 19% in FY 2024, and to 17% in FY 2025. FY 2026 year-over-year revenue growth is expected to be even lower. Following an implosion in the Company's growth rate, Elastic's FY 2025 revenues were only $1.48 billion, or

10

more than half a billion dollars short of the goal the Defendants had previously announced. The decline in revenue from the Company's cloud solutions was even starker. After reporting a year-over-year increase of 80% in FY 2022, the year-over-year growth rate declined to 42% in FY 2023, 29% in FY 2024 and 26% in FY 2025.

35.     The significant decline in growth imperils Elastic's future and lowers its value to investors. Elastic is a relatively small player in a market dominated by giants like Microsoft, Google, and Amazon. Its securities are considered a growth stock because the industry in which Elastic operates is exploding, fueled by advances in Generative AI and large language models.

36.     Importantly, Elastic needs to grow its way out of unprofitability. As of April 30, 2025, Elastic had an accumulated deficit of $1.1 billion. It lost $236.2 million in FY 2023, and while it earned a small profit of $61.7 million in FY 2024, it swung back to a net loss of $108.1 million in FY 2025. At its current scale, Elastic is not a profitable company. It therefore must grow substantially to earn profits. For instance, in an August 17, 2023 report, a TD Cowen analyst predicted that Elastic would continue to trade "at a constrained multiple [of revenue] unless growth can reaccelerate to >20%." A JP Morgan analyst likewise explained that his price target for Elastic was lower than its competitors' valuation because of Elastic's low growth rate.

*Defendants Told Investors that Elastic's Sales Strategy Was Working*

37.     Even as sales growth slowed, Defendants continued to assure investors that Elastic's sales strategy was succeeding. For example, in a June 1, 2023 discussion of Elastic's Q4 2023 earnings, an analyst asked about "any major changes or tweaks you're making on the go-to-market" for FY 2024. Moorjani responded that "the go-to-market strategy [Elastic's term for its sales strategy] fundamentally for us will largely continue to be the same" because "it's working quite nicely." Then, in a February 29, 2024 discussion of Elastic's Q3 2024 earnings, Moorjani

reiterated that Elastic's "sales motions are actually working quite well, both in terms of securing the initial commitments and then, of course, working with these customers to ramp their consumption."

38.    At the same event, Kulkarni further told investors that he expected the Company's go-to-market strategy to remain the same with no changes "as the business continues to do well in areas like generative AI, in terms of platform consolidation . . . ."

39.    Defendants also specifically stated that Elastic was meeting its sales goals. For example, in a December 7, 2023 presentation at the Barclays Global Technology Conference, Defendant Moorjani told investors that:

> What we want to be is, be disciplined about how we're investing in the business. And we've got a lot of experience with – in many different areas. When we hire salespeople, we've got our internal models around productivity and how we want to see these people ramp … So as long as we're doing the right things and seeing the right results, if we fail it's okay but we want to fail fast and make sure that we [cost?] correct pretty quickly so that we can continue to shift dollars to the right places. And that's been the approach that we've adopted. It's worked quite nicely for us this year.

### *Elastic Internally Concludes that Its Sales Model Is Failing*

40.    Contrary to the false statements Defendants made during the Class Period, Elastic had internally concluded that its sales model was failing with negative trends that had accumulated in the last three to four years. On April 15, 2024, Elastic held an all-hands meeting to internally disclose and explain that the Company was overhauling the sales organization. The presentation diagnosed long-running problems with Elastic's sales function, which had caused deteriorating performance. As stated in one slide:



*"AE" is Account Executive, Elastic's term for salespeople.*

*"N&E" is New & Expanding, referring to new deals with existing customers or new customers.*

*"CS" is Customer Success (i.e., customer support).*

41.    As more fully set out in the slide itself, Elastic identified the causes of poor performance as poor territory design and segmentation, as well as underinvestment in associated sales functions. These problems occurred over the previous 3-4 years (*i.e.*, since 2020/2021). Elastic also identified the trends that had been observed for the last 3-4 years that required Defendants to overhaul the sales organization:

a.    Over 60% of the sales representatives did not meet their target in the year that ended on April 30, 2023, and less than 30% were on track to meet their target in the year expected to end on April 30, 2024;

b.    Higher customer attrition and significantly lower growth in new deals with existing customers or new customers;

c.    Poor sales productivity; and

13

d.  Underinvestment in customer support, services and marketing.

42.    Multiple CWs corroborate the declining trends identified in the presentation, and confirm that the problems were long running and well understood.

43.    CW1 was a Sales Development Representative in Elastic's U.S. East and Canada region from April 2022 through February 2025, working out of Elastic's Austin office. CW1 reported to Romy Seidenman, who was first Sales Development Manager of East Enterprise, Sales Development Manager II of East Enterprise & Strategic Accounts, then Senior Sales Development Manager – East Enterprise & Canada. CW1 was responsible for identifying potential new clients and analyzing their data needs to determine what products to pitch to customers. After vetting, CW1 passed along the accounts to AEs.

44.    According to CW1, before the Company made the segmentation changes, Elastic organized its accounts by the number of each customer's employees. Senior AEs would be responsible for customers with a large number of employees, dubbed Enterprise. Other AEs in the Commercial segment would be responsible for smaller customers. According to CW1, AEs in the Commercial segment could easily be responsible for three to four times as many accounts as representatives in the Enterprise segment, or more.

45.    According to CW1, the number of a customer's employees is only loosely correlated to the need for Elastic's services. CW1 cited as an example that a large retail store with hundreds of employees will likely have significantly lower data needs than a tech startup or small medical group. As a result, according to CW1, junior AEs were regularly overloaded by small companies with high data needs, while senior AEs frequently had too few customers because some of their customers had low data needs. As set out above, CW1's job was to identify prospective clients and their data needs, and thus CW1 was familiar with these issues. CW1 confirmed that the

14

trends discussed in the slides were the reason the Company gave to employees for why it made the segmentation changes.

46.     CW2 was an AE at Elastic from December 2022 through October 2023, who worked with Elastic's clients on the West Coast. CW2 started in Elastic's Enterprise segment, where CW2 reported to Elastic Regional Vice President, Enterprise West, Marcela Rysbekov. Four months later, CW2 was moved to the Strategic Sales Team. CW2's boss was quickly fired; thereafter, CW2 reported to the Area Vice President of West, CW4, who reported directly to Elastic's Chief Revenue Officer ("CRO").

47.     CW2 confirms that before the segmentation changes, Elastic divided customers into mid-market (anything less than 1,000 employees), Enterprise (1,000-10,000 employees), and Strategic (more than 10,000 employees). Mid-market/commercial representatives typically had 50-100 accounts, Enterprise representatives typically had 10-15 accounts, and Strategic representatives only had a few accounts.

48.     CW2 reports that CW2's account list included "random companies" with no connection to the tech industry, as well as other accounts that had a low potential of ever resulting in any revenues. In fact, CW2 reports that only three to four of CW2's accounts were paying customers. Because CW2 left Elastic in October 2023, the problems existed long before the April 2024 presentation.

49.     CW3 was Elastic's Regional Vice President for West Commercial from May 2022 through October 2023. CW3 reported to the successive Vice Presidents of Americas Kate Fitzgerald and Ryan Thomas ("Thomas"). CW3 also reports that prior to the reorganization, Elastic segmented its customers by number of employees.

50.     In December 2022, CW3 attended a meeting in New York that included senior managers and senior leadership to discuss the restructuring of sales teams. According to CW3, at this meeting, the Company decided to source consulting vendors to help plan the restructuring. CW3 adds that CW3 was personally involved in discussions about how to restructure the sales organization in October 2023.

51.     CW3 confirmed that the team was not hitting metrics. Moreover, CW3 stated that CW3's team struggled with renewing business with active clients. CW3 said that during CW3's tenure, the sales team was missing pipeline targets, which meant that there were not enough deals in the pipeline or at a certain stage that had been forecasted for the year. For instance, deals were in an earlier stage of a deal, such as stage five, when they should be later in the sales cycle at stage seven or eight. The fact that deals were behind in the stages compared to where they should have been at adversely affected the sales team members' closing rates and their ability to satisfy their quotas. CW3 confirmed the All Hands meeting slide admitting that the sales team was widely underperforming in meeting its quotas. According to CW3, only about 10% of teams were hitting quotas and 10% were at 80-100% of quotas. Moreover, 60% of the teams were below 50% of quota.

52.     CW3 confirmed that the information in the presentation slide set forth in ¶40 was accurate, stating that the sales representatives could not meet their targets. CW3 also corroborated CW4's timeline, and stated that CW3 was involved in discussions about how to restructure the sales organization in October 2023. CW3's account also corroborates the N&E decline identified in the April 2024 presentation. CW3 confirms that N&E growth following the pandemic was weak, and management set unrealistic N&E goals.

16

53.     CW4 was an Area Vice President at Elastic from January 2023 to October 2024. Initially, CW4 was hired as Area Vice President for the Western United States (New Mexico to Hawaii). CW4's title changed with the reorganization, at which point Elastic added the Central United States to his responsibilities. CW4 reported to Ryan Thomas, Elastic's Vice President of Americas, who reported to Kulkarni before December 2023 and CRO Mark Dodds ("Dodds") thereafter. CW4 was responsible for $100 million following the reorganization. CW4 worked out of Elastic's San Francisco office.

54.     In or around October 2023, CW4 learned that Elastic had hired the consulting firm Bain & Company ("Bain"). According to CW4, Bain was paid about $2 million for its work. According to CW4, one of Bain's most important contributions was a categorization of accounts by propensity to spend rather than employee count. Bain recategorized Strategic accounts as those with the potential to spend $5-10 million, Enterprise accounts as those who could spend $1-4 million, and smaller accounts as Commercial. The segmentation changes Defendants first disclosed and discussed with investors on August 29, 2024 resulted from Bain's work.

55.     Thus, CW4's account confirms the accounts of CW1 and CW2, both of whom state that prior to the segmentation changes disclosed to investors on August 29, 2024, Elastic organized customers by employee size rather than propensity to spend.

56.     Other former employees also corroborated the negative trends and adverse metrics displayed in the April 2024 presentation based on their own personal knowledge and experience.

57.     For instance, CW2 explains that it was difficult to meet sales quotas because customers had little interest in moving away from Elastic's open source (or free) platform to paid subscriptions. The value in Elastic's platform came from customer service, but clients who used open-source platforms did not need customer support. CW2 corroborated the information

17

presented at the April 2024 meeting, including that customer attrition increased by 20%. CW2 states attrition increased because clients preferred open-source solutions, and, as a result, CW2 was unable to renew contracts with large clients in early to mid-2023, including Nvidia and Robert Half.

58.    CW5 was Elastic's Senior Director of Sales Development in the Americas region (U.S., Canada, and South America) from August 2020 through May 2024. From November 2021 to February 2024, CW5 reported to Adam Gross, Vice President, Global Sales Development; thereafter, CW5 reported to Gross's replacement, Morgan Kirkland. CW5's direct reports informed CW5 that sales representatives struggled to meet their quotas. According to CW5, it was common knowledge that salespeople on the Commercial sales team struggled to hit their numbers.

59.    The AEs who were not hitting their targets were falling well short of the mark. CW6 was an AE in Elastic's public sector division from Spring 2023 through July 2024. CW6 reported to Dave Babyak, Elastic's Public Sector Director, who reported to Chris Townsend, Vice President for Public Sector. According to CW6, in the public sector team, only a relatively small proportion of salespeople hit their targets. The remaining salespeople fell dramatically short, typically reaching only about 30-40% of their quota.

60.    CW7 was an AE in the State & Local Government division from May 2023 through December 2024. According to CW7, Elastic internally published a leaderboard ranking all the salespeople in its public client sales team. The leaderboard showed how much of their quota each salesperson had reached, as well as each salesperson's sales.

61.    According to CW7, state and local teams were constantly called out for underperformance. CW7 states that public sector AEs were required to continually have at least $250,000 of committed deals in their forecast at all times. If they did not, they would receive an

angry phone call from Chris Townsend, and their jobs would be imperiled. So, according to CW7, salespeople were regularly fabricating deals and recording them on Salesforce, which made it seem like the AEs were building their pipeline. As CW7 explained, "you spend most of your day putting in funk data just to save your job. It wasn't real."

62.     According to CW4, in a well-functioning sales organization, about 65-85% of sales representatives meet or exceed their quotas. Yet, CW4 explains that in the Americas, less than 40% of teams hit their number in FY 2024. Even fewer (25%) Enterprise AEs met their quota. CW4 explains that Elastic implemented segmentation changes out of desperation, stating that:

> No one was really making any numbers with regularity. So it seemed we had to do something. I didn't know what that was but we all kind of felt we need to do something.

63.     CW8 was the Director of Global Partner Marketing from July 2020 to May 2024. CW8 closely worked with the field marketing and sales team. CW8 corroborates that marketing was underfunded as the April 2024 presentation admitted. The underfunding was reflected in decreased Elastic presence at industry and marketing events. According to CW8, in 2023, marketing attended only half the events that were attended in the past.

64.     CW9 was an Enterprise AE at Elastic from 2022 through 2023 in the San Francisco Bay Area. CW9 explained that "s**t was hitting the fan" as to customer attrition and contraction. According to CW9, the market shifted dramatically, specifically as Amazon OpenSearch was gaining traction and competitors such as Datadog were growing. CW9 explained that Amazon had a similar product to Elastic, and since so many businesses already were using Amazon Web Services, it was easier for Amazon to poach Elastic's customers. According to CW9, greenfield accounts, meaning new customers, took longer to close than accounts for which Elastic had prior relationships. According to CW9, more than 50% of the sales representatives missed their quotas, confirming the data identified in the April 2024 presentation.

65.     CW10 was a Partner Manager in Elastic's Public Sector Business from February 2022 to September 2024. CW10 first reported to Federal Senior Partner Director Susan Keys, until she left the Company in January 2023, then reported to Vice President of Public Sector Chris Townsend until Keys was replaced in April or May 2023 with Darryl Peek, current Vice President of Partner Sales for the Public Sector. According to CW10, sales managers pressured AEs to seek commitments from customers, even after the customers had already declined interest in Elastic's products. Specifically, CW10 said that there was pressure to pull in deals earlier and convince customers to sign deals before a quarter ended. CW10 added that it was common for managers to get fired immediately after losing a deal.

*Changes Became Concrete and Negatively Impacted Sales Early in the Class Period*

66.     After CW4 learned of the segmentation changes in October 2023, it took little time for the changes to solidify. CW4 states that beginning 3-4 months before Defendants claimed that the segmentation changes were rolled out on May 1, 2024, the changes were already concrete. At that time, CW4 began participating in high-level weekly meetings to fine tune the plan. The meetings were attended by Thomas and all the Area Vice Presidents in the Americas.

67.     According to CW4, the segmentation changes were "draconian" and "felt extreme." CW4 states that 100% of CW4's team's accounts were changed. CW1 corroborates CW4's account, stating that some of Elastic's top AEs also had accounts reassigned.

68.     Predictably, the segmentation changes had a dramatic effect on sales. As CW4 told Thomas, both in the meetings and in other fora, the changes were bound to hurt sales, at least temporarily, because a typical sales cycle is nine months long, and the segmentation changes would extend that cycle as AEs attempted to close new deals. All the other Area Vice Presidents known to CW4 were similarly critical of the segmentation changes. CW4 states that CW4 and all

the other Area Vice Presidents understood that the sales force would struggle for the next six to nine months because of the segmentation changes.

69.     In addition, CW4 explains that some accounts were miscategorized. For example, while CW4 was able to keep Starbucks in the Enterprise segment despite Defendants' desire to shift it to the Commercial segment, CW4 was unable to do so for many other accounts, which reduced the amount of revenue CW4's team could generate.

70.     CW1, a former Sales Development Representative in Elastic's U.S. East and Canada regions, corroborates CW4's account. According to CW1, AEs rely on their client relationships to accelerate deals. But some of Elastic's clients felt slighted or put off when assigned a new AE. CW1 explained that Elastic's poor performance in the first quarter of 2025 was because of the negative trends identified in the April 2024 presentation that led to the segmentation changes, not slipped deals discovered during the last few days of the quarter as Defendants falsely stated.

71.     CW1 reports that the segmentation changes caused the pace of deals to slow down because AEs who had the same accounts for years suddenly lost those accounts to new AEs. CW1 states further that the segmentation changes were already a touchy subject before the sales kickoff meeting occurred on May 13, 2024. CW1 explained that sales cycles increased because the AEs had no prior relationship with their new customers and lacked familiarity with each new deal. CW1 recalled conversations with sales representatives in the West and East regions who struggled to meet their quotas. CW4 corroborated this account and explained that switching up AEs caused delay in closing deals.

72.     CW11 was the Senior Director of Brand at Elastic from August 2021 through March 2025. CW11 reported to Rhodes Klement, Senior Vice President of Corporate Marketing,

who reported directly to Kulkarni until February 2023, and then later to the Director of Marketing, Matt Donoghue. CW11 managed fourteen people in the Brand department, and created and executed the Company's brand strategy. CW11 confirmed that CRO Mark Dodds was hired in late 2023 to execute the Company's reorganization, including greater focus on Enterprise clients. CW11 explained that as part of the shift in strategy, the Company directed attention to customers' C-Suite executives, as opposed to developers and practitioners. Kulkarni told CW11 that the Company needed to focus on customers' C-Suite executives. CW11 explained that sales representatives struggled with implementing this new strategy because they were not trained in how to communicate with C-Suite executives.

73.    CW11 attended two meetings in the Spring of 2024 with Kulkarni and other Vice Presidents to discuss the changes. Kulkarni led the meetings, and the entire C-Suite at the time (including Moorjani and Dodds) was present. At the first meeting, the participants, including CW11, discussed how to prioritize customer accounts. At a second meeting, which included the C-Suite executives, the participants discussed branding for Enterprise clients. At this meeting, CW11 told Kulkarni that Elastic's pivot to Enterprise clients would be problematic because the Company could not accommodate the changes quickly without adequate resources.

74.    CW11 also confirmed that Kulkarni was a micromanager who made substantially all of the Company's decisions, including changes to the Company's sales strategy and how to allocate resources for marketing.

75.    CW12 was a Strategic Account Director at Elastic from September 2022 to December 2024, working out of its San Francisco office. CW12 reported to an Area Vice President based out of New York. CW12 initially excelled at Elastic, reaching between 150-200% of CW12's quota in the first year and 100% and 150% of the quota in the second year. Despite this

success, CW12 was reassigned to the Enterprise segment after the segmentation changes were made. Having lost all clients, CW12 was not even on track to reach 50% of the FY 2025 quota by the time CW12 left in December 2024. When CW12 complained of the account reassignments to the Enterprise Regional Vice President, that individual responded that the assignments constituted a reorganization.

76.     CW13, a Principal on Elastic's onboarding team from November 2021 through January 2025, attended an all hands meeting in July or August of 2024. At this meeting, Thomas, the head of Americas at Elastic, told the participants that the Company would be in trouble within the next six quarters at the rate things were going. At this meeting, the Company also decided to pause employee travel due to its financial position.

## II.    Materially False and Misleading Statements Issued During the Class Period

77.     On June 1, 2023, the Company held a conference call to announce Elastic's financial results for the fourth quarter of 2023. During the scripted portion of his remarks, Kulkarni claimed that Elastic maintained a "strong gross retention rate," similar to prior quarters:

> Our differentiated platform capabilities and our compelling total cost of ownership make our platform incredibly sticky ***and have allowed us to maintain strong gross retention rate in Q4, similar to prior quarters***.

78.     The statements identified in Paragraph 77 were materially false and misleading when made because they omitted to disclose that: (a) customer attrition and contraction had increased by over 20%; (b) the rate of growth for new deals with existing customers or new customers declined by over 35%; (c) Elastic was underinvested in customer success; (d) the material adverse trends identified in (a) through (c) had developed for several years before the Class Period commenced; and as a result (e) Kulkarni misled investors by claiming that Elastic was "maintain[ing] strong gross retention rate[s]" without also disclosing that the rates were falling precipitously.

23

79.     Moorjani also told investors during this conference call that sales representatives were at the right level of capacity, and would achieve their productivity thresholds in FY 2024:

**Q - Pinjalim Bora**

Got it. Very helpful. And one for Janesh. Janesh, the guide, when I'm looking at it, you talked about the sequential growth in Q4, the subscription sequential growth is basically flat. You're guiding to about 16%, sounds like it's more of a second-half story. Help us understand the kind of the confidence on that second-half build. From what you're saying, it sounds like there are some mechanics with the contracts that I guess, we can't see. But obviously, you have a strong RPO. But I'm just trying to understand what gives you confidence for that to kind of reach that guide in the second half? And maybe help us understand the consumption trends so far in Q1 that you are seeing.

**A - Janesh Moorjani**

Yes. Pinjalim, as I think about the full year, a couple of things, and I touched on this a little bit earlier but I will elaborate a bit further. So if you think about the way our contracts mechanically work, because we have either one-year contracts or we have -- if we have multi-year contracts, typically have annual breakpoints. And given the strength that we saw in contractual commitments that customers have made to us over the course of Q3 and Q4, and we were actually quite pleased with the outcome overall even here in this quarter that we just wrapped up, as I look at all of those commitments, there are effectively natural mechanisms embedded in those contracts. So that as customers consume against those contracts over the course of this year, we will see that translate to revenue. We're working actively with them for commitments that they've made to bring those workloads onto Elastic and to see that consumption ramp. But consumption can fluctuate from quarter-to-quarter depending on what actually happens with respect to that customer activity.

So if the consumption ramps, that's great. But even if consumption trends stay similar to where they are in the first half, and that's the way we've built the model based on the Q1 guide, I am just thinking about the first half overall. We will naturally start to see those contracts anniversary and we will then hit those breakpoints in the second half. So that gives us a good degree of visibility to ensure that there are certain amounts of revenue that will be recognized in fiscal '24. So that's the mechanical aspects of the contracts. And that's why I was referring to the -- if you looked at the short-term deferred revenue and you look at how much short-term deferred revenue we've added in the second half of fiscal '23, you will see it's significantly higher than the short-term deferred revenue we added in the second

24

half of last year and that gives me a degree of comfort and confidence around, around the full-year.

***And then the other piece is with respect to the field capacity that we've been adding, we've entered fiscal '24 with the right amount of capacity that we expected to have. We continued hiring in the back half of fiscal '23. And so, those salespeople will also naturally start to achieve their productivity thresholds that we have in the business.***

So putting all that together, we feel really good about our outlook for the year. In terms of what May has looked like and Q1 so far, in general, the top-of-funnel activities that we generally have in the month of May have been very consistent with what we've seen in the past. May, because it's the first month of our fiscal year, there's always other kinds of activities that happen, we've had our sales kickoff, for example in the month of May. But I'll say it's been a fairly typical May in terms of what we would have expected based on some of the internal activities and some of the general top-of-funnel activities.

80.    The statements identified in Paragraph 79 were materially false and misleading when made because they omitted to disclose that: (a) Elastic determined that it had underinvested in customer support, services, and marketing, all of which constitute "field capacity"; (b) AEs were required to fill in the gaps created by this underinvestment, "eating up bandwidth and impacting our productivity"; (c) fewer than 40% of sales representatives met their targets in FY 2023; (d) the trends identified in (a) through (c) developed over three to four years; (e) sales representatives had then missed their quotas as corroborated by CW1, CW2, CW3, CW4, CW5, CW6, and CW9; and as a result (f) by omitting the facts described in (a) through (e), Moorjani misled investors when he said that Elastic had the right capacity with sales representatives, and was on course to achieve productivity thresholds.

81.    As the conference continued, Moorjani continued to tout the sales strategy as "working quite nicely," without need to change:

**Q - Brent Thill**

25

Janesh, you mentioned, the May sales kickoff. When you go into this next fiscal year, are there any major changes or tweaks you're making on the go-to-market? Or is it pretty much following the same playbook you followed last fiscal year?

**A - Janesh Moorjani**

Hey, Brent. ***The go-to-market model fundamentally for us will largely continue to be the same. If I think about the structures that we've had and the model that we've put in place, it's working quite nicely. We are continuing to focus on building commercial and enterprise sales coverage. We've also had success with our focus on cloud, and we see that in the strong commitments. And the sales force is effectively much more focused on selling cloud.*** We are increasing our focus on consumption as well a little bit and starting this fiscal year, we've actually included a small consumption piece to the sales compensation plan as well, I think that will help overall as we think about scaling the cloud business in the future.

And if I think about the other elements of our go-to-market around our partnerships with the hyperscalers and the marketplaces, those are all working very nicely for us as well. As you saw with the announcements with AWS, we are putting a lot of energy into this area. So we feel good about our overall go-to-market structure, but looking forward to executing here in Q1 and the rest of the year.

82.     The statements identified in Paragraph 81 were materially false and misleading when made because they omitted to disclose that: (a) a majority of sales representatives failed to meet their targets in FY 2023 as explained in the April 2024 presentation and corroborated by the accounts of CW1, CW2, CW3, CW4, CW5, CW6, and CW9; (b) AE productivity declined by over 30% due to poor territory design; (c) the Company was already underinvested in customer success, marketing and services; (d) customer attrition was already up significantly and N&E growth was already down significantly; (e) AEs became less productive because their roles expanded to too many functions; (f) the adverse trends identified in (a) through (e) had already begun to emerge before these false statements were made; and as a result (g) the Company's growth and results of operation had already been negatively affected by a decline in productivity and reduced sales. As such, the Company's structures and model were not then "working quite nicely," the sales force was not then "much more focused," customer commitments were not then "strong," and adverse

26

trends that put Defendants on notice of all of these facts had already emerged before these false and misleading statements were made.

83.    On June 16, 2023, the Company filed an Annual Report with the SEC on Form 10-K for the FY that ended on April 30, 2023 ("2023 10-K"). The 2023 10-K contained the following misleading statements concerning the Company's sales productivity and its potential negative impact on the Company's ability to add new customers and grow revenues:

> ***If we do not effectively develop and expand our sales and marketing capabilities, including expanding, training, and compensating our sales force, we may be unable to add new customers, increase sales to existing customers or expand the value of our existing customers' subscriptions and our business will be adversely affected.***
>
> We dedicate significant resources to sales and marketing initiatives, which require us to invest significant financial and other resources, including in markets in which we have limited or no experience. Our business and results of operations will be harmed if our sales and marketing efforts do not generate significant revenue increases or increases that are smaller than anticipated.
>
> We may not achieve revenue growth from expanding our sales force if we are unable to hire, train, and retain talented and effective sales personnel. We depend on our sales force to obtain new customers and to drive additional sales to existing customers. We believe that there is significant competition for sales personnel, including sales representatives, sales managers, and sales engineers, with the requisite skills and technical knowledge. Our ability to achieve significant revenue growth will depend, in large part, on our success in recruiting, training and retaining sufficient sales personnel to support our growth, and as we introduce new products, solutions, and marketing strategies, we may need to re-train existing sales personnel. For example, we may need to provide additional training and development to our sales personnel in relation to understanding and selling consumption-based arrangements and expanding customer usage of our offerings over time. New hires also require extensive training which may take significant time before they achieve full productivity. ***Our recent hires and planned hires may not become productive as quickly as we expect***, and we may be unable to hire or retain sufficient numbers of qualified individuals in the markets where we do business or plan to do business. As we continue to grow rapidly, a large percentage of our sales force will have relatively little experience working with us, our subscriptions, and our business model. Additionally, we may need to evolve our

sales compensation plans to drive the growth of our Elastic Cloud offerings with consumption-based arrangements. Such changes may have adverse consequences if not designed effectively. ***If we are unable to hire and train sufficient numbers of effective sales personnel, our new and existing sales personnel are unable to achieve desired productivity levels in a reasonable period of time, our sales personnel are not successful in obtaining new customers or increasing sales to our existing customer base, or our sales and marketing programs, including our sales compensation plans, are not effective, our growth and results of operations could be negatively impacted, and our business could be harmed.***

84.     The statements identified in Paragraph 83 were materially false and misleading when made because they omitted to disclose that: (a) a majority of sales representatives had failed to meet their targets in the then-complete FY 2023, as was later conceded in the April 2024 presentation and corroborated by the accounts of CW1, CW2, CW3, CW4, CW5, CW6, and CW9; (b) AE productivity declined by over 30% due to poor territory design; (c) the Company was already underinvested in customer success, marketing and services; (d) customer attrition was already up significantly and N&E growth was already down significantly; (e) AEs became less productive because their roles expanded to too many functions; (f) the adverse trends identified in (a) through (e) had already begun to emerge before these false statements were made; and as a result (g) the Company's growth and results of operation had already been negatively affected by a decline in productivity and reduced sales.

85.     The 2023 10-K also misleadingly described hypothetical risks to the Company's growth in the following manner:

***Our business and operations have experienced rapid growth, and if we do not appropriately manage future growth, if any, or are unable to improve our systems and processes, our business, financial condition, results of operations, and prospects will be adversely affected***.

We have experienced rapid growth and increased demand for our offerings. Our employee headcount and number of customers have increased significantly. For example, our total number of customers has grown from over 2,800 as of April 30, 2017 to approximately 20,200 as of April 30, 2023. Further, although we

implemented a workforce reduction in November 2022 and may modify our hiring to align with our evolving growth plans, our employee headcount generally has increased as we have expanded our business. The growth and expansion of our business and offerings place a continuous and significant strain on our management, operational, and financial resources. In addition, as customers adopt our technology for an increasing number of use cases, we have had to support more complex commercial relationships. ***We may not be able to leverage, develop and retain qualified employees effectively enough to maintain our growth plans. We must continue to improve our information technology and financial infrastructure, our operating and administrative systems, our relationships with various partners and other third parties, and our ability to manage headcount and processes in an efficient manner to manage our growth effectively. Our failure to do so could result in increased costs, negatively affect our customers' satisfaction with our offerings, and harm our results of operations.***

86.    The statements identified in Paragraph 85 were materially false and misleading when made because they omitted to disclose that: (a) customer attrition and contraction had already increased; (b) productivity had already declined significantly; (c) sales representatives substantially missed their quotas as admitted in the April 2024 presentation and corroborated by multiple CWs; (d) the Company was already underinvested in customer success, services and marketing as admitted in the April 2024 presentation and corroborated by CW8; and as a result (e) the adverse trends identified in (a) through (d) that had developed over several years had already negatively affected customer satisfaction, and Elastic's business, results of operations, financial condition and prospects.

87.    On August 31, 2023, the Company held a conference call to announce the financial results for the first quarter of 2024, in which Moorjani made the following false and misleading statements touting the Company's retention rates:

**Q - Koji Ikeda**

Got it. Thanks so much, Janesh. And just one follow-up here looking at net revenue retention of 113%. Is it too early to call a potential bottom or how do we -- how

should we be thinking about visibility into the bottom of net revenue retention going forward?

**A - Janesh Moorjani**

Yeah, the net expansion rate in the first quarter, it moved as we had expected it would. You'll recall that we had covered this on the prior earnings call as well, and we had said that we would expect it to go down. And I think the decline in the net expansion rate reflects the two themes that we had mentioned earlier on commitments and consumption. So for cloud contracts commitments generally don't count towards the net expansion rate, while consumption does. So the strong commits are not in the number, but the slower consumption is. And then over time as the consumption against the committed contracts ramps that will naturally help the net expansion rate over time.

*If I think about that from a different angle, our gross retention rates remain very strong and we didn't see any change versus the prior quarter.* So the slower net expansion rate has been from slower expansion. *So as I mentioned as the consumption against committed contracts ramps, that will naturally help the expansion number.* And finally, as you know, the net expansion rate is a lagging indicator, it's a trailing 12-month measure. So as consumption ramps, it will take some time for that to be fully reflected in the net expansion rate. We will continue to monitor that as we go, but so far it's playing out as we had previously predicted.

88.    The statements identified in Paragraph 87 were materially false and misleading when made because they attributed slower net expansion rates solely to cloud customers delaying ramping up to their committed levels of consumption, a problem that would solve itself when the cloud customers reached their commitments. In truth, Elastic was experiencing 20% higher customer attrition and contraction, N&E growth was down over 35%. Customer attrition and contraction had increased by over 20%. These were more serious problems that were not self-correcting.

89.    On that same conference call, Kulkarni made the following statements about the Company's sales approach "paying off in larger commits":

**Q - Shrenik Kothar**

Got it. Thanks a lot, Janesh. And just very quickly, I mean, I know there was earlier question around consolidation correlation with -- with multiple use cases, including gen AI. I was just wondering like, are you also seeing kind of direct correlation with this kind of enterprise focus top down motion and consolidation as well? And are you guys kind of going about in a strategical fashion, not just like as I said, targeting industries or verticals, but just kind of in terms of kind of larger commitments and trying to target accordingly?

**A - Ashutosh Kulkarni**

*Yeah. I mean, so -- like we've talked about, right in prior calls as well, our focus on enterprise selling has been strong and we've talked about the fact that we've been very strategically focusing on customers that have a greater propensity to grow with us.* And that includes customers in the Enterprise segment, that includes customers in the Commercial segment. And one of the levers that we have been really focused on is our ability to deliver highly differentiated value at an incredible price for our customers because of the strength of our platform and its ability to deliver on multiple real-time search use cases, whether it be for search observability or security incredibly well. *And so we've been leaning into that as a motion, irrespective of vertical and geography. So we've been driving that motion with our sales organization and it's paying off. It's paying off in larger commitments. It's paying off in more workloads coming onto our platform and us taking share and it's reflecting now in some of the benefits that we're seeing in revenue.*

90.    The statements identified in Paragraph 89 were materially false and misleading when made because they omitted to disclose that: (a) Elastic focused on clients with a large number of employees rather than clients "that have a greater propensity to grow with us"; as a result of these segmentation deficiencies and others, (b) customer attrition and contraction had already increased; (c) the rate of growth for new deals with existing customers or new customers had already substantially decreased; (d) sales productivity had declined dramatically as demonstrated both by Elastic's internal documents and multiple CW accounts pled herein; (e) the material adverse trends identified in (a) through (d) had developed for several years before the Class Period commenced; and as a result (f) Elastic was not focused on clients with the propensity for growth,

the actual sales strategy of focusing on clients with a large number of employees was failing, not "paying off," and Elastic's sales were not then "strong."

91.     On September 1, 2023, the Company released its 2024 Q1 10-Q. Defendants repeated substantially the same statements as those made in Elastic's 2023 10-K set forth in Paragraphs 83 and 85, which remained false and misleading for the same reasons identified in Paragraphs 84 and 86.

92.     On September 5, 2023, Kulkarni and Moorjani spoke at an investor conference hosted by Goldman Sachs. At this conference, Kulkarni again claimed that the Company's sales strategy was "paying off incredibly well":

> **Q - Kash Rangan**
>
> Ash, I had one final question for you. I could ask you more questions, but I know you've got to go as well. Really appreciate you coming. So, how are you thinking about, industry's gone through retrenchment, freezes, layoffs, et cetera. You guys had your layoffs a while ago. How are you open to hiring at this point and picking up the pace of hiring?
>
> **A - Ashutosh Kulkarni**
>
> Yeah. We are already hiring, right? So, what you should expect is we are going to continue to hire. We're going to hire in the places where we see the biggest opportunity for growth. ***So, whether it's in R&D, in areas of marketing where we'll continue to invest.***
>
> We have a strong position in generative AI. We feel really good about where we are, but I see this market continuing to grow. And we want to make sure that we are not only leading now, but we are leading three years from now, five years from now. So, we're going to invest in those areas.
>
> Also in sales capacity. We made a very strategic decision that we're going to service the SMB segment through self-service, ***but we're going to focus our sales energy on the enterprise and commercial segments and that's paying off incredibly well for us when you look at the larger commitments that we are seeing from customers. So, we'll continue to make investments in those areas. So, we are hiring, but the model is such that we feel really good about the operating leverage***

*that we get in the model as we continue to grow. And so, we feel very confident that we'll be able to both grow and drive profitability as we go forward[].*

93.    The statements identified in Paragraph 92 were materially false and misleading when made because they omitted to disclose that: (a) customer attrition and contraction had already increased; (b) the rate of growth for new deals with existing customers or new customers had already substantially decreased; (c) Elastic had underinvested in customer success, marketing and services; (d) sales productivity had declined dramatically as demonstrated both by Elastic's internal documents and multiple CW accounts pled herein; (e) the adverse trends identified in (a) through (d) caused Elastic to have an "out-of-date segmentation model"; (f) the material adverse trends identified in (a) through (d) had developed for several years before the Class Period commenced; and as a result (g) Elastic's sales strategy in Enterprise and Commercial was not "paying off" but was then massively misaligned, and Kulkarni knew that there were significant risks to both growth and profitability.

94.    On November 30, 2023, Elastic held its Q2 2024 earnings call. During the Question-and-Answer session of that call, Moorjani made the following statements about the Company's "strength" in commitments and in sales execution:

**Q - Brad Reback**

Great. Thanks very much. Janesh, last year you had a really strong booking quarter as customers began to increase their commits. How should we think about that comp for this quarter?

**A - Janesh Moorjani**

*And the way I think about -- great. The way I think about that is, you know, customers are continuing to make commitments to Elastic. We've seen that strength in commitment as we think about just ongoing execution that we have, as we think about the engagement that our field teams have with them.* Ash talked about all of the trends in generative AI that are continuing to provide a good tailwind to that. *So, we feel very good about our overall position in front of customers.* You know, in terms of how that translates into specific commitments

for Q3, it's too early to tell for that. And again, we aren't going to sort of provide forward views on commitment or bookings-oriented measures. We feel very good about the revenue outlook we've provided and I think that continues to be the primary measure for us in the business.

95.    The statements identified in Paragraph 94 were materially false and misleading when made for the same reasons identified in Paragraph 93 because Elastic's sales organization was not then executing well as Defendants later admitted. In addition, the statements identified in Paragraph 94 were materially false and misleading when made because they omitted to disclose that: (a) substantial work on changing the segments had already taken place in October 2023 or before these false statements were made as confirmed by CW3 and CW4; and as a result (b) Defendants misled investors by referencing continued strength in customer commitments and omitted to disclose facts undermining their claim that Elastic's "overall position in front of customers" was "very good."

96.    On that same Q2 2024 earnings call, Kulkarni made the following statements about the Company's sales execution with existing customers, in which he said the team was "executing really well":

**Q - Shrenik Kothari**

Hey, thanks for taking my question and congrats on the great execution, Ash and Janesh. Welcome back, Anthony. So Ash, you touched upon evolution in Elastics go to market strategy before shift towards more efficient and unified vision for customer engagement and partnerships in light of the recent realignments, including the consolidation under the CRO. And then today, you highlighted generative AI beginning to positively impact the go to market around search. Of course, you spoke about relationships with major hyperscalers and beyond that, investments into broadening the Global Reach User Conference. Can you talk about which of these factors like the Hyperscaler Partnerships User Conference directly spreading awareness are bigger drivers currently? And in terms of the strategic realignment of go-to-market, how are you positioning effectively in the AI landscape now? Thanks a lot.

**A - Ashutosh Kulkarni**

Shrenik, thanks for the question. What I will say is that, look, all of the things that we are doing matter, right? Because at the end of the day, our ability to best satisfy our customers comes from the fact that we are able to provide them unique, differentiated, functionality with the integrations with all the ecosystem partners. And we have relationships with these ecosystem partners like the cloud hyperscalers that allow us to reach and service those customers very, very effectively. And our focus not just on commitments, but also on consumption, you know, all of that is paying off, right? ***So it's about having a very cohesive strategy. And I'm very excited about the fact that the team has been executing very well. I'm very proud of the work that they've been doing, and we feel really good about both the second half of the year and the future.***

97.     The statements identified in Paragraph 96 were materially false and misleading when made for the same reasons identified in Paragraphs 93 and 95. As such, Kulkarni misled investors when he claimed that Elastic's strategy was "cohesive," the team was "executing very well," and he felt "really good about both the second half of the year and the future."

98.     On December 1, 2023, the Company released its quarterly results on Form 10-Q ("Second Quarter 2024 Form 10-Q"). In this SEC filing, the Company repeated substantially the same statements as those made in Elastic's 2023 10-K set forth in Paragraphs 83 and 85, which remained false and misleading for the same reasons identified in Paragraphs 84 and 86.

99.     In addition, they were materially misleading because, before the Second Quarter 2024 Form 10-Q was filed, substantial work on changing the sales segments had already taken place in October 2023 (before these false statements were made) as confirmed by CW3 and CW4.

100.     On February 29, 2024, the Company held an earnings call to announce the financial results for the third quarter of 2024. During this call, Kulkarni introduced Dodds as the new CRO. Kulkarni explained that Dodds "leads all of Elastic's customer-facing functions, including global sales, customer success, solutions architecture, professional services, ecosystem and partnerships, and sales operations." During the Question-and-Answer session of the earnings

conference, when asked about Elastic's go-to-market strategy, Kulkarni assured investors that Dodds' hiring did not mean that changes would be made to Elastic's sales strategy:

**Q - Raimo Lenschow**

Hey, thank you. Congrats from me as well. Two quick questions.

One, Ash, with the change in leadership now on the go-to-market side, are there any kind of changes you've seen on the journey to kind of evolve go-to-market? But any changes we should anticipate as we're kind of getting ready for the new year? And then I had one follow-up for you, Janesh.

**A - Ashutosh Kulkarni**

Absolutely. So, we're very excited about Mark's addition. I mean, he's been -- even in the short time that he's been here, he's just been a wonderful partner, and it's impressive to see how he's really, he's dived into the job, he's working very closely with the team members, and the natural leadership that he's demonstrating is wonderful.

***Look, what I'd say is the direction that we are on, our focus on the enterprise and commercial segments, our overall go-to-market strategy, I expect that to remain the same. We are seeing a lot of success with that. Janesh touched upon that earlier, and we are very excited about the expertise that Mark brings in those areas, and we know that as the business continues to do well in areas like generative AI, in terms of platform consolidation, Mark's skills are only going to help us do even better.***

***And at this point, I'm not expecting any change. It's really like the progress that we have made and the direction that we have set, I feel that Mark's going to add to it as opposed to make any changes.***

101.    The statements identified in Paragraph 100 were materially false and misleading when made because they omitted to disclose that: (a) fewer than half of the sales force met its quota, customer attrition had increased, sales productivity had decreased and the Company was underfunded in customer success, services and marketing; (b) "draconian" segmentation changes had been made that reorganized territories for substantially all AEs because of the negative trends observed for years; and as a result (c) neither fact conveyed by Kulkarni's statement (that the strategy was working and that Elastic would not change the strategy) was true.

36

102.    On this same February 29, 2024 Q3 2024 earnings call, Moorjani made the following statements about increasing consumption and commitments:

**Q - Pinjalim Bora**

Great. Thanks, guys, for taking the question. Congrats on quarter. I want to dig in a little bit on the Elastic Cloud side. Janesh, this year seems like so far we have seen a little bit of a different seasonality. Q2 was a much higher sequential uptick versus Q1, which is typically the opposite. And then Q3 seems like it was a little bit of a downtick versus Q2, which is, again, typically opposite.

Was there anything one-time in Q2 which did not repeat in Q3? Or did you see kind of slightly lower consumption rate versus last quarter, or maybe it seems like the, if I got that correctly, 14% monthly seems like the variability was a little bit of a drag. So maybe any color there would be helpful, and how do you kind of think about the sustainability of that growth at 29%, 30% for total cloud?

**A - Janesh Moorjani**

Hey, Pinjalim. Yes. Let me unpack that for you. So, first off, if I just step back, we were actually very pleased with our overall performance in the quarter, including on cloud, coming in at 29% year-over-year growth. Broadly speaking, I'd say it played out as we expected it would.

If I think about the pieces in that, first off, there was nothing unusual or one-time in Q2 that didn't recur in Q3, to just take that off the table. *But if I think about the performance during Q3, as we look at our performance across the segments, we did really well in both commercial and enterprise, which, as you know, is our sales-led motion, and then we drive the consumption after we've secured the commitments.*

*And then, on the SMB side, which is predominantly in the self-serve motion, that piece remained soft, and that's been soft for a little bit of time now, so even that played out as we expected it would, but it was basically consistent with where it's been.*

*And so just given the relative growth in monthly cloud versus the rest of our cloud revenue, that's what drove monthly cloud to 14% of revenue versus 15% in the prior quarter or 16% in the year ago period. So I'd say, broadly speaking, our sales motions are actually working quite well, both in terms of securing the initial commitments and then, of course, working with those customers to ramp their consumption.*

37

If I think about the seasonality and all the different elements you called out, in fact, in a way that's just reflective of the nature of consumption, which, as we've said, can fluctuate from time to time, if I think about consumption patterns across the quarter, though I'd say Q3 was generally stable across the board as we mentioned earlier.

And so, overall, when I look back at all the moving parts, we were actually quite pleased with our cloud performance, and we look forward to delivering a strong Q4.

103.    The statements identified in Paragraph 102 were materially false and misleading when made because: (a) fewer than 40% of sales representatives had met their FY 2023 targets, while fewer than 30% were on track to meet their FY 2024 targets; (b) other critical sales metrics that Elastic tracked, including customer attrition and contraction, N&E growth, and sales productivity, were falling; (c) Elastic had recognized that it had underinvested in important parts of the sales teams including customer success, services and marketing; (d) at this time, Elastic had already decided to embark on a risky reorganization of its sales organization because its sales strategy was failing; (e) the Company's sales strategy was not "doing well" or "working quite well" as Moorjani falsely stated; and (f) the "sales-led motion" was in decline and was the reason for Elastic's poor performance.

104.    On March 1, 2024, the Company filed its Q3 2024 Form 10-Q, which repeated substantially the same statements as those made in Elastic's 2023 10-K set forth in Paragraphs 83 and 85, which remained false and misleading for the same reasons identified in Paragraphs 84 and 86.

105.    On March 6, 2024, Moorjani attended an investor conference hosted by Morgan Stanley, and repeated his false and misleading statements about the state of Elastic's sales strategy at that time:

**Q – Analyst**

Yes. That's a great overview, and very consistent with what we've heard from some of the other companies that have presented this week. To pick up on Ash's framing, Janesh, the sort of mix between optimization activity from the customers and then ultimately bringing on new workloads, whether it's GenAI or observability, security, conceptually, what does it take to -- for Elastic to reassert sort of 20% growth? Like what's the sort of the framework to getting that?

**A - Janesh Moorjani**

Yes. I think as Ash touched on this in terms of maybe just starting with some of the broader trends we've seen, I think the macro is generally stable. In terms of consumption, one of the things that we had talked about a few quarters ago, and the industry was talking about this trend of consumption optimization, that also seems to have leveled off and things were relatively stable. And I think what we are seeing now is fundamentally that people have -- as they've been consolidating on -- their workloads onto Elastic and making these commitments to us, they've been ramping their consumption and continuing to grow their usage of Elastic. And I think that's what we saw quite strongly in Q2. We built on that further here in the third quarter.

So we feel very good about just our overall positioning from the standpoint of both the competitive landscape as well as the engagement that we've got with customers, not just on GenAI, but on security and observability as well. I think we've seen good balanced growth across those. The sales motions across logging and SIEM in particular are working really well. ***So for us, it's just a question of continuing to stay the course and continuing to drive execution.***

We will see how we finish our fourth quarter here, and that's obviously the seasonally biggest quarter for us in terms of bookings and sales activities as is for so many software companies in their fourth quarter, and that will really set the pace for us in terms of next year. But overall, as I look at the external landscape, I look at our competitive positioning, ***I look at how well the sales team has been executing***, we feel really good about the future.

106.    The statements identified in Paragraph 105 were materially false and misleading when made because they omitted to disclose that: (a) fewer than 40% of sales representatives had met their FY 2023 targets, while fewer than 30% were on track to meet their FY 2024 targets; (b) other critical sales metrics that Elastic tracked, including customer attrition and contraction, N&E growth, and sales productivity, were falling; (c) Elastic had recognized that it had underinvested

in important parts of the sales teams, including customer success, services and marketing; (d) at this time, Elastic had already decided to embark on a risky reorganization of its sales organization because its sales strategy was failing; and as a result (e) Defendants knew that the sales team was not executing "well," and it was not "just a question of continuing to stay the course."

107.    On May 30, 2024, the Company held a conference call to announce the financial results for the fourth quarter of FY 2024, in which Moorjani downplayed any risk to the Company's guidance, and claimed that the Company was then well-positioned for long-term growth and profitability:

> *Turning to guidance, as we look into fiscal '25, we remain focused on execution and believe that we are well-positioned for long-term growth and profitability. Our guidance philosophy remains unchanged from fiscal '24. We remain prudent in the near term and assume that current business conditions will remain stable.* Our sales strategy remains focused on the Enterprise and Commercial segments, where we continue to believe that offering customers the choice on whether to deploy on-premise or in the cloud is a competitive differentiator for us. Accordingly, we expect continued momentum across both self-managed and annual cloud subscriptions depending on customer preference.

108.    The statements identified in Paragraph 107 were materially false and misleading when made because they omitted to disclose that: (a) fewer than 40% of sales representatives had met their FY 2023 targets, while fewer than 30% were on track to meet their FY 2024 targets; (b) other critical sales metrics that Elastic tracked, including customer attrition and contraction, N&E growth, and sales productivity, were falling; (c) Elastic had recognized that it had underinvested in important parts of the sales teams, including customer success, services and marketing; (d) at this time, Elastic had already decided to embark on a risky reorganization of its sales organization because its sales strategy was failing; and as a result (e) Moorjani's claim that Elastic was well-positioned for long-term growth and profitability was materially misleading when made.

109.    Also on the May 30, 2024 earnings call, Moorjani made the following statements about the Company's ability to attract new customers and generate more business from existing customers and cloud based solutions:

**Q - Austin Dietz**

Hey. Thanks, guys. Janesh, just to unpack the growth in cloud this past 4Q. Looking at the annual business, the annual cloud business, it's been growing in the mid-40s in 2Q and 3Q and it looked like it picked up a little bit further to 50% in 4Q. So I guess what's been the biggest driver of that stability you're seeing in the annual cloud business? And then how are you feeling about the durability of that growth in annual cloud as we move into fiscal '25?

**A - Janesh Moorjani**

*Hey, happy to take that. So fundamentally, as I think about our land and expand motion, it's been working quite nicely. We've talked over the last several quarters about the investments that we've been making to drive that and the strength of the commitments and the strength of the consolidation that we are seeing onto the Elastic platform. And that's all been playing out quite nicely*.

We obviously had a strong finish here in Q4 as well. And so *fundamentally, those drivers continue to play out, and we are seeing strength both in the Enterprise and Commercial segments from that selling motion*. And that's offset a little bit, as I mentioned, on the monthly cloud side, by some of the broader macro weakness in the SMB segment.

But as we move forward into fiscal '25, we're continuing to focus our sales efforts in Enterprise and Commercial and continuing to drive those expansion plays, particularly with -- in areas like GenAI, in areas like platform consolidation and I think that's actually working quite nicely for us. *So we've been pleased with the performance of cloud so far, and we're looking forward to Q1 and the rest of the year.*

110.    The statements identified in Paragraph 109 were materially false and misleading when made because they omitted to disclose that: (a) N&E growth had, in fact, decreased by over 35% over several years; (b) fewer than 40% of sales representatives had met their FY 2023 targets, while fewer than 30% were on track to meet their FY 2024 targets; (c) other critical sales metrics that Elastic tracked, including customer attrition and sales productivity, were falling; (d) Elastic had recognized that it had underinvested in important parts of the sales teams, including customer success, services, and marketing; (e) at this time, Elastic had already decided to embark on a risky

41

reorganization of its sales organization because its sales strategy was failing, which would cause cloud revenue to decrease as Defendants admitted themselves immediately after the Class Period; and as a result (f) the land and expand strategy was not working, and revenue from cloud based solutions was already at risk.

111.    As the May 30, 2024 earnings call continued, Moorjani made the following false and misleading statements regarding sales execution in FY 2024:

**Q – Analyst**

Hey guys. This is <analyst> on for Mike Cikos over at Needham. Thanks for taking our question. You guys have been clear that consumption will vary quarter to quarter, but is there anything you can call out as far as expected seasonality or shape to consumption in fiscal '25? And on that note, are you expecting 2Q to be as seasonally strong as this past year?

**A - Janesh Moorjani**

***Hey, <analyst> maybe I'll take that. And as I sort of look back at fiscal '24, I'm actually very happy with the consistent execution that we had across all the four quarters of fiscal '24.*** Very proud of how the whole team delivered. As I think about fiscal '25, we've obviously just initiated guidance for the full year at 16% year-over-year growth, and for Q1, at 17% year-over-year growth. ***I expect that revenue will continue to ramp nicely over the course of the year.*** And so as we think about the specific numbers for Q2 and beyond, I think it's too early to tell. So we'll provide you with a better view on Q2 specifically as we get to the end of Q1, but we expect that revenue will ramp nicely over the course of the year.

112.    The statements identified in Paragraph 111 were materially false and misleading when made because they omitted to disclose that: (a) Defendants had known that Elastic's sales strategy in FY 2024 had failed, in that as of April 2024, fewer than 30% of sales representatives were on track to meet quota and various critical metrics had already declined; (b) Elastic had already concluded that it needed to make "draconian" segmentation changes that reorganized its sales territories for substantially all of its AEs; and as a result (c) sales execution in FY 2024 was problematic, and revenue was already at risk.

113.     As the conversation continued, Kulkarni was asked about Elastic's go-to-market strategy, and he suggested that Dodds was driving sales execution positively, but withheld adverse facts that rendered his statements misleading:

**Q - Ittai Kidron**

Can you elaborate on the go-to-market side? Because what you've described is a lot of product enhancements and benefits, but what have you changed on the go-to-market side to try and capitalize on this?

**A - Ashutosh Kulkarni**

Yeah, look, we got out of our sales kickoff just a couple of weeks ago, and this is one of the area that our sales teams are most excited about. So we have clear campaigns that are going after this opportunity as you can imagine. And literally, the way we talk to our sales team is the two questions that we need to be asking is, one, what vector database are you using? To every customer, that's the question that we should be asking. And the second, are you using any of these incumbent security or log analytics technologies that haven't been delivering value, haven't been innovating? ***And we are seeing success with that motion. So it is absolutely a big go-to-market focus for us and the discipline and just the up-leveling of everything that Mark Dodds, our CRO, is doing is just something I'm very excited about.***

114.     The statements identified in Paragraph 113 were materially false and misleading when made because they omitted to disclose that: (a) Elastic implemented sweeping and "draconian" changes to segmentation that rearranged accounts for substantially all of Elastic's employees; and as a result (b) Elastic was not then "seeing success in that motion," and Kulkarni's mischaracterization of making major risky changes as "up-leveling" was thus misleading.

115.     On June 4, 2024, Moorjani spoke at the Bank of America Securities 2024 Global Technology conference. When recapping the Company's earnings results from the previous quarter, Moorjani falsely stated that Elastic observed "strong customer growth" that was "set[ting] us up very nicely for the fiscal year '25":

**Q - Koji Ikeda**

So you guys just reported your results last week. So super excited to have you guys here today. And maybe talk about from a very high level, some of the key takeaways from the earnings report. And I think a little bit more importantly is how have your discussions with investors been post and maybe the top one or two questions coming from them following the earnings?

**A - Janesh Moorjani**

*I think -- so we had a great Q4, and it was a great way to cap off the year. So we printed a fairly strong growth across our total revenue, across our cloud revenue.*

*We beat on all of the metrics that we normally guide to in terms of total revenue as well as profitability.*

*We had very strong customer growth in the categories that we measure.*

*And so it was a good clean healthy print all around, and I think sets us up very nicely for the fiscal year '25 that we just started.* Within the overall numbers, a couple of the highlights that we focused on were around the customers that are using us for GenAI workloads, particularly using our vector search functionality and RAG functionality and all of that in the cloud.

For a few quarters now we've been talking about a couple of hundred customers incrementally that we've been adding for some time. And we finally crossed the 1,000 customer mark on that front. So that was really encouraging.

The other interesting data point was if I look at some of our larger customers that spend more than $100,000 a year with us in ACV, we reported that more than 145 of those customers are now using us for our vector search and RAG capabilities and that number is triple what it was a year ago.

*So again, great momentum on that front. And so it was really encouraging and a great way to cap off the year.*

In terms of what people are thinking about and some of the questions we've been getting, have been focused a little bit on just trying to understand the momentum that we've got on the GenAI side as well as just trying to get a read of what the broader market environment looks like and how that might color our outlook in terms of the guidance that we provided.

So those have been some of the areas of focus, but happy to talk about those, if you like.

116.    The statements identified in Paragraph 115 were materially false and misleading

when made because: (a) Moorjani's claim that "we had very strong customer growth in the

categories that we measure," which followed his statement that Elastic performed well on measures that it discloses, gave investors the misleading impression that Elastic had also performed well on internal metrics; (b) Moorjani's additional claim that Elastic had "great momentum," coupled with his statement that Elastic had performed well, gave investors the impression that it was not making dramatic, risky changes; (c) Elastic had performed poorly on sales productivity, the proportion of AEs meeting quota, N&E growth, and customer attrition; (d) this performance was so poor that it had forced Elastic to undertake the risky reorganization that threatened revenues; and, therefore (e) the impression Moorjani gave that Elastic had recorded good metrics and was not undertaking especially risky steps was misleading.

117.    On this same call with Bank of America, Moorjani falsely explained that "staying very close to our customers" was paying off with "general stability at this point in time"

**Q - Koji Ikeda**

You mentioned late calendar '22. And so when I think about software companies as a group and how they reported and how they talked about it, that feels pretty early, right? When you guys are actually calling it out, we are seeing some softness. And now you've been talking about things stabilizing, even maybe getting a little bit better out there. Stable is good, right?

And so it feels like you're first to see demand get better. And so why is that? Is it something specific about what you're selling into, like the end market or the opportunity? And what would, in your view, need to happen for things to get incrementally worse out there from what you're saying?

**A - Janesh Moorjani**

Yes. So maybe just to step back in 2022, I don't think we saw it first, and I don't think we are seeing a recovery first.

In 2022, software was impacted broadly. And we saw it just like many other players when the industry saw it. And you will remember that time when people started to talk about how they're optimizing consumption and so forth.

So for us, what we've just seen is this continuing pattern where people have optimized as much as they can and want to, and they've turned the dials to the left

as much as they can and as much as they want to. And it's not like they are turning the dials all the way back to the right again.

It's not that they are relaxing the constraints that they had put in place.

So when we say it's stable, it sort of reached that level of people are cost conscious and they are focused on operational efficiency. And because we help them achieve that efficiency and drive them, that actually acts as a net benefit to us in our business.

So I don't think we will see those demand signals earlier than other people will.

***One of the things that we learned over the course of the last two years is obviously the importance of staying very close to our customers. And we made big investments in the customer success function as an example, and that's the team that works with customers to drive consumption, helps them get the best return on the investments that they've already made with Elastic, even if that means helping them understand how they can use their Elastic deployments better and more efficiently.***

***So those are all things that we've done. And I think what we see is general stability at this point in time.***

118.    The statements identified in Paragraph 117 were materially false and misleading when made because Moorjani's claim that "we made big investments in the customer success function" in the previous two years contradicts Elastic's internal conclusion that "we were very under invested in areas like [customer success]," services and marketing, as explained in the April 15, 2024 presentation identified and described herein.

119.    On June 12, 2024, Moorjani presented at the Mizuho Technology Conference. Asked about Dodds, Moorjani responded:

**Q - Gregg Moskowitz**

Okay, terrific. And I'm glad you mentioned Mark, because obviously, that was an important hire for Elastic. Any other focus areas under Mark's leadership that you would call out?

**A - Janesh Moorjani**

*I would describe it as evolutionary, not revolutionary. No fundamental change in the strategy. I think the strategy has been working quite nicely for us for the past several quarters, as everyone may have seen from the results. We did some of the normal evolution that you would have in any field sales organization at the start of the year.* We talked a little bit about the platform consolidation theme.

The other theme that he focused folks on was on everything related to generative AI and the opportunity there. And there, it starts with a simple question to a customer, what vector search database are you using? And from there, that leads to an amazing set of discovery questions, because everyone's thinking about this, and so it became really powerful for our field sales organization. And beyond that, I think it's going to be continuing to build on some of the longer-term capabilities that we know we need to build in the field sales organization

120.    The statements identified in Paragraph 119 were materially false and misleading when made because: (a) Moorjani's claim gave investors the misleading impression that there would be no dramatic, risky changes to Elastic's sales strategy because the strategy was working; but, by this time (b) Elastic had already decided that its sales strategy was failing, in that fewer than half of salespeople were meeting their quotas and various critical metrics were rapidly declining; (c) as a result, Elastic had already embarked on a new radical change; (d) Elastic had already made segmentation changes that reorganized its sales territories for substantially all of its AEs; (e) these changes were "fundamental"; and, therefore, (f) neither fact conveyed by Moorjani's statement (that the strategy was working and that Elastic would not change the strategy) was true.

121.    On June 14, 2024, the Company released its Form 10-K for FY 2024 ("2024 10-K"). The 2024 10-K repeated substantially the same statements as those made in Elastic's 2023 10-K as set forth in Paragraphs 83 and 85, which remained false and misleading for the same reasons identified in Paragraphs 84 and 86.

## III.   Additional Allegations of Scienter

### A.   Defendants' Own Statements Are Indicative of Knowledge

122.   Throughout the Class Period, Defendants made statements demonstrating not only access to information, but actual knowledge of the underlying facts that rendered their representations misleading, and a practice of monitoring those facts. For instance, Moorjani repeatedly told analysts that the Company had learned over the last few years the importance of "staying very close to our customers." Specifically, on the May 30, 2024 conference call held to announce Elastic's results for the fourth quarter of 2024, Moorjani told an analyst that "we've learned over the last couple of years that when customer spending priorities are shifting, it's really important for us to stay very close to them." He further claimed that "that's exactly what we are doing right now with our sales and customer success teams," and added that "we're going to continue to monitor things carefully as we move forward."

123.   Moorjani repeated these kinds of statements when he participated in a conference call to announce the Company's results for the fourth quarter of 2024 on May 30, 2024, and when he attended the Bank of America Securities 2024 Global Technology conference on June 4, 2024. At the latter event, Moorjani falsely asserted that Elastic had achieved "general stability at this point" because "one of the things that we learned over the course of the last two years is obviously the importance of staying very close to our customers. And we made big investments in the customer success function as an example . . . ."

124.   One cannot "stay very close to" customers yet simultaneously not know that sales representatives have massively missed targets over the last two fiscal years, with new and expansion rates down and customer attrition up, especially as those devastating facts were admitted internally.

125.    On March 12, 2024, Thomas, the head of Americas at Elastic at the time, was interviewed on Steven Rosen's Sales Leadership Awakening podcast. During the interview, Thomas said that Elastic tracked pipeline conversion *"very closely,"* examined whether sales representatives' productivity was declining or improving on a quarter-to-quarter and year-over-year basis, and determined the growth rate on an account level by "looking at whether we are covering the right accounts with the right go-to-market strategy and the right cost structure." These monitored metrics were the same ones that caused Elastic to make segmentation changes. While Thomas admitted that senior management at Elastic knew about the key metrics that resulted in the segmentation changes, he did not disclose that those changes had already been made when he spoke during Rosen's podcast or disclose that poor performance regarding those very same metrics required Elastic to overhaul the sales organization.

126.    The Individual Defendants also told investors that they frequently met with customers themselves. For example, on the conference call held to announce the financial results for the third quarter of 2024 on February 29, 2024, Kulkarni described how he had "met with customers around the globe" during the third quarter of 2024.

127.    Defendants also initially denied that they had made any material changes during the Class Period, and later claimed that any modification made by the new CRO, Dodds, to the sales organization was merely evolutionary rather than a fundamental change in strategy. Some of these statements were made merely weeks before Defendants admitted to making the segmentation changes that altered Elastic's growth trajectory materially downwards.

128.    Beginning on August 29, 2024, the Individual Defendants began to publicly admit that they played a central role in reorienting the segments, and provided investors with granular details on what changes were made. For example, on the conference call held to announce the

financial results for the first quarter of 2025 on August 29, 2024, Kulkarni explained that specific changes were made in the Strategic and Enterprise segments to focus attention on larger accounts by reducing the number of customers per representative and landing new customers through greenfield territories.

129.    At the same conference call, Moorjani explained that the segmentation changes resulted in "slipped deals" that were not lost, but were expected to close later in the year, and Defendants misleadingly claimed that they could not anticipate the impact of the changes until the last few days of the first quarter of 2025, concealing the year-over-year negative trends known to them that were the real reasons for the changes in the first place. Kulkarni also added that he was working personally with Dodds to focus more of his attention on how deals progressed through the stages to close. He further explained that the greatest impact of the segmentation changes was in the Americas, and affected all the verticals except for the public sector in the U.S.

130.    Defendants' decision to speak at length about the topic of segmentation repeatedly between August 2024 and May 2025, but selectively disclose some information concerning the topic while concealing facts that were adverse enhances a strong inference of scienter. Defendants either knew the facts they were misrepresenting and concealing, or were reckless in holding themselves out as knowledgeable if they had chosen to speak authoritatively about these subjects without bothering to learn the actual facts.

**B.    CW Accounts Enhance a Strong Inference of Scienter**

131.    Several CW accounts support a strong inference that the Individual Defendants knew or recklessly disregarded facts that rendered their statements misleading. CW6, CW5, CW3, and CW4 each confirmed that only 30-40% of the sales team reached their targets during FY 2023 and 2024, and/or severely lagged behind their goals during this time. CW2 described a significant

failure to retain large clients such as Nvidia and Robert Half in 2023, and CW3 confirmed that the West Commercial Region was underperforming in renewals in FY 2023, which corroborates the account of CW1 that the Company was experiencing falling retention rates at the time. CW3 confirmed that only 20% of Elastic AEs made 80% or more of their quota, and CW3 attended weekly meetings at which quotas were discussed. And CW7 explained that the Company tracked exactly what percentage of quota every AE in the public client sector was achieving on a leaderboard that ranked all the AEs.

132.    CW3 confirms that senior management knew that the sales force missed quotas because weekly forecasting meetings discussed the status of quotas, and these meetings included Thomas, as well as the Vice President of Business Operations, Regional Vice Presidents and Area Vice Presidents. CW3 stated that Kulkarni and Moorjani knew about the problems with the forecasts because, Thomas knew about Regional Vice Presidents' forecasts, and he shared this information with the CRO, CEO and CFO.

133.    It is not conceivable that the Individual Defendants would not know these specific facts given that they approved the segmentation changes, spoke at length about those changes with investors and analysts, and ultimately conceded after the Class Period that the changes were made to improve the negative trends that had developed and were identified in internal company documents unavailable to investors.

134.    Defendants also had real-time access to negative information that was inconsistent with their misleading statements made to investors. CW1 explains that every deal was documented in a Salesforce database. CW1 further stated that the Company used Clari to project numbers and develop forecasts. Clari is a software tool that provides a sales organization with information about the status of sales representatives, the sales pipeline, and forecasts with real-time accuracy to

monitor deals and sales representatives and determine whether it is short on pipeline. According to the provider, Clari allows executives to "[s]pot risk before it slips" and "give teams more visibility and control over revenue outcomes." *See* https://www.clari.com/products/analyze/. Clari, at the least, would inform the Individual Defendants about the very adverse trends from years before the Class Period that ultimately caused them to make the segmentation changes.

135.    Elastic senior management held weekly forecasting meetings at which poor sales performance was regularly discussed. Based on these weekly forecasting meetings, CW3 concluded that only 20% of AEs reached 80% or more of their quota, and that 60% of AEs reached less than half of their quota. These meetings were widely attended, including by the Senior Vice President of North America and the Vice President of Business Operations. CW3 further believes that the Individual Defendants were briefed on the meetings by the Senior Vice President of North America.

136.    CW11 confirmed Kulkarni's hands-on leadership style, as well as his participation in multiple meetings in Spring 2024 (before several misrepresentations were made) in which Kulkarni and other high-level executives discussed implementing the new sales strategy, and Kulkarni was warned that the Company was not ready to implement the new strategy.

137.    CW8 further confirms Moorjani's hands-on leadership style, as he participated in biweekly calls concerning the decline in small business subscriptions in 2023. Moorjani was thus aware of the Company's lagging sales performance well in advance of the segmentation changes made in 2024.

138.    CW accounts also confirm that Defendants knew both about the timing of the segmentation changes as well as the impact those changes had much sooner than they publicly acknowledged. According to CW3, Elastic decided at a senior management meeting that it needed

to reorganize its sales force in a meeting that occurred in New York in December 2022. Further, Elastic had decided that the changes were of such magnitude that it needed to hire one or more consulting firms to advise it. Thus, Elastic's senior management was aware of the segmentation problems well before the Class Period's start.

139. CW1 and CW4 each confirmed that Elastic hired Bain several months in advance of FY 2025, and that Bain's work resulted in the segmentation changes. CW4, the Area Vice President in the Americas West and Central, confirmed that by the time CW4 became involved in the segmentation changes at the end of calendar year 2023, the changes were already concrete and complete, and their effect on the sales organization occurred many months before July 2024. This contradicts Defendants' false claim that they did not understand the true impact of the segmentation changes until a few days before the first quarter of FY 2025 ended.

140. CW4 managed a team that was responsible for around $75 million in revenue before the segmentation changes, and $100 million in revenue after the segmentation changes. CW4 met several times per week with Thomas, the head of the Americas region, as well as all other Area Vice Presidents, for 3-4 months in advance of May 1 to discuss the changes' roll out. CW4 received a spreadsheet in advance of this detailing the new assignments and who was going to be laid off. CW4 complained directly to Bain regarding the changes in advance of their implementation. The spreadsheet changed 100% of CW4's team's accounts. CW4 confirmed that the account changes lengthened the sales cycle, which Defendants would know since they repeatedly discussed the benefits of "staying close" to Elastic's customers. CW1 confirmed that by the time the sales kickoff meeting was held on May 13, 2024 the segmentation changes were already a "touchy subject" among the sales team.

53

141.     Executives at the Company, including Kulkarni, were aware that the Area Vice Presidents, including but not limited to CW4 vociferously objected to the segmentation changes because the reorganization would negatively impact sales. The account of CW4 is particularly persuasive because CW4 reported to Thomas, who reported to Kulkarni directly during the Class Period.

**C.     The Core Operations Doctrine Raises an Inference of Scienter**

142.     Defendants' scienter is also supported by the fact that the alleged misstatements and omissions concerned core operations of Elastic.

143.     For the FY ending April 30, 2024, Elastic's revenue from the United States represented 57.6% of the Company's overall revenue. No other individual country exceeded 10% of the Company's total revenue during FY 2024 or the two prior FYs. For FY 2025, the U.S. represented 56.4% of the Company's overall revenue, and once again no other country accounted for 10% or more of the total revenue during the FY. Defendants told investors that the segmentation changes affected only the Americas, their largest source of revenue.

144.     Accordingly, it would be absurd to assume that the Individual Defendants were unaware of why wide-scale changes in the most important market in which the Company operated were needed, when specifically those changes were made and what the impact of those changes would be on the Company's business and operations.

**D.     The Temporal Proximity and Sharp Divergence Between Defendants' Misleading Statements and the Emergence of the Truth Further Bolsters an Inference of Scienter**

145.     The temporal proximity and sharp divergence between Defendants' misleading statements and subsequent disclosures further support an inference of scienter.

146.     On February 29, 2024, when directly asked whether investors should "anticipate" "any changes" "as we're kind of getting ready for the new [fiscal] year," Kulkarni explained that

"at this point, I'm not expecting any change" and that new CRO Dodds was not going "to make any changes." However, CW allegations show that the Company was already implementing changes within Elastic's sales organization and had been planning to do so for months. *See* ¶¶50, 54, 66, 68, *supra*. CW allegations also confirm that the nature of the changes was such that the Individual Defendants knew about their disruptive impact on Elastic long before the end of the first quarter of 2025 as they both falsely claimed. On June 12, 2024, Moorjani, discussing Dodds' hire, again falsely assured investors that there was "[n]o fundamental change" to the Company's sales strategy.

147.    On May 30, 2024, the Individual Defendants continued to signal confidence in their financial guidance while indicating not only that all was well with Elastic's sales organization, but also giving no indication that changes to sales operations were underway and were needed because of known issues. *See* ¶¶40, 41, 50, 54, 66, 68, *supra*. Defendants again concealed this information when Elastic filed its 2024 10-K.

148.    But just a few weeks later, on August 29, 2024, Elastic had no choice but to reveal that major sales segmentation changes were implemented at the Company, and that these changes would drastically reduce the Company's growth rate for an indefinite period of time.

149.    Consequently, the temporal proximity between Defendants' assurances and change of course, along with the sharp divergence between Defendants' Class Period reassurance and the truth, make it inconceivable that Defendants did not know (or at least recklessly disregarded) that the changes were underway before they told investors they were made, and that they knew the changes would negatively impact Elastic's business and operations long before the end of the first quarter of 2025 as they falsely claimed.

### E.      Post-Class Period Admissions

150.    When they continued to speak to investors and analysts about the segmentation changes after the Class Period ended, both Kulkarni and Moorjani admitted to the fact that reorienting the business was not merely caused by a need to reassign accounts to sales representatives. The Individual Defendants explicitly tied the segmentation changes to sales productivity, pipeline creation and progression, and declining expansion rates, corroborating the concealed reasons identified in internal documents for the need to change the sales organization's operations.

151.    For example, at the Goldman Sachs Communacopia Technology Conference held on September 9, 2024, Kulkarni admitted that the segmentations changes were necessary to improve sales productivity in order "to make us able to do larger deals," and "become more and more efficient on the go-to-market side." During the conference call held on November 21, 2024 to announce the Company's financial results for second quarter of 2025, in response to a question about how the changes would play out later in the year, Kulkarni stated that the state of pipeline creation and progression "has come back to normal," and "win rates continue to be incredibly strong."

152.    During the conference call held on February 27, 2025 to announce the Company's financial results for the third quarter of 2025, Kulkarni told investors in his opening remarks that the segmentation changes had increased Elastic's focus on "landing and expanding enterprise and high potential mid-market customers." He again stated that the changes had improved pipeline creation and progress, leading to more customer commitments, and demonstrated that the "expand motion is working."

153.    In conference calls held between September 2024 and May 2025, Elastic also admitted that the impact of the segmentation changes did not amount to a mere speed bump, but

would take several quarters to resolve, negatively affect year-over-year growth, and particularly have adverse effects on the Company's cloud revenue. For instance, at the 27th Annual Needham Growth Conference held on January 16, 2025, interim CFO Eric Prengel was asked to explain whether the long-term effect from the shortfall in the first quarter of 2025 would magnify as the year progressed. Eric Prengel responded that because cloud revenue was based on actual customer consumption that historically ramped up as the year progressed, the shortfall in commitments in the beginning of the year created a "headwind" "not only to the quarter immediately following the commitment not coming through, but even more so to the quarters that come after that, be it two or three quarters after in terms of that commitment shortfall."

## IV.    Loss Causation

154.    The truth about the Company's poor sales growth began to emerge on February 29, 2024. On February 29, 2024, after the market closed, the Company announced its financial results for the third quarter of 2024. In a press release, the Company disclosed slower than expected cloud revenue growth (29%). Analysts reacted negatively. For example, a Barclays analyst stated that: "Cloud Deceleration Raises Questions" and "we expect a pullback in the near term." Truist Securities similarly noted that shares were coming under pressure as investors were looking for cloud revenue growth of more than 30%. On March 1, 2024, Jefferies cut its price target for Elastic from $150 to $140. This was the beginning of when the concealed risk started to materialize, and ultimately resulted in Defendants admitting at the end of the Class Period that the impact from the shortfall in commitments in early 2025 would be particularly pronounced at the end of 2025 because of a failure to grow cloud revenue. *See also* Section III(E).

155.    In the same press release, Elastic also disclosed that its performance had deteriorated along a number of other sales-related metrics. Net expansion rate measures the amount of revenues earned in the prior twelve months against the same metric in the quarter one year prior,

but excludes any new customers. Both customer attrition and the failure to expand sales to existing customers thus reduce the net expansion rate. In the third quarter of FY 2024, Elastic's net expansion rate fell to 109%, a historic low. As a Canaccord Genuity analyst reported, "[b]ears may also be picking at [net expansion rate] of 109%, declining 1pp from Q2." Likewise, a Goldman Sachs analyst cited the "steady decrease in Net Expansion Rates … as keeping us sidelined."

156.    Remaining Performance Obligations ("RPO") is a metric that reflects the remaining obligations Elastic's customers owe on their existing contracts. In the third quarter of 2024, RPO growth fell to 18% year-over-year, down from 24% the previous quarter. A Barclays analyst cited the decline in RPO as a key negative, alongside cloud growth deceleration. Likewise, a Jefferies analyst stated that "decelerating [RPO] growth … [is] weighing on the stock in the [near term.]" On March 1, 2024, Jefferies cut its price target for Elastic from $150 to $140.

157.    On this partial disclosure or the materialization of the concealed risk thereof, the price of the Company's common stock fell from $133.81 at market close on February 29, 2024 to close at $117.01 on March 1, 2024, a decline of 12.6%. The stock price continued to drop on March 4, 2024, the next trading day, closing at $108.40, down another 7.4%, as the market continued to absorb the news.

158.    On August 29, 2024, during after-market hours, Elastic issued a press release announcing its financial results for the first quarter of 2025 (the "Q1-25 Earnings Release"). Therein, Defendants disclosed that they had slashed the Company's FY 2025 revenue guidance to a range of $1.436 billion to $1.444 billion, representing 14% year-over-year growth at the midpoint of $1.440 billion—significantly down from their prior FY 2025 revenue guidance of $1.468 billion to $1.480 billion, or 16% year-over-year growth at the midpoint of $1.474 billion. In addressing the Company's significantly reduced FY 2025 revenue guidance, the Q1-25 Earnings Release

58

quoted Kulkarni, who stated that the volume of customer commitments declined because of the segmentation changes, and revenue for the year would decline as a result. This came as a surprise to investors. Elastic typically sets conservative revenue guidance which it then substantially exceeds. As a Wells Fargo analyst observed in a February 26, 2024, report, from Q3 2019 through Q2 2024, Elastic always beat its quarterly guidance, on average exceeding guidance by 1.4%. Because Elastic exceeds its quarterly guidance, annual guidance gradually increases throughout the year. To see Elastic's annual revenue guidance decreasing by 2.3% was unheard of.

159.    The same day, also during after-market hours, Defendants hosted a conference call with investors and analysts to discuss Elastic's financial results for the first quarter of 2025. During this conference call, Kulkarni and Moorjani discussed the segmentation changes at length, and provided specifics on how the Company's sales strategy had actually dramatically changed, including through restructuring the Strategic and Enterprise segments, reassigning or reducing sales representatives' accounts and developing ways to target new customers through greenfield territories. Defendants also told investors that the segmentation changes impacted all verticals in the Americas except for Elastic's business with the federal government.

160.    On this partial disclosure or the materialization of the concealed risk thereof, the price of Elastic's common stock fell by 26.5% from $103.64 per share at closing on August 29, 2024 to close at $76.19 per share on August 30, 2024.

161.    Analysts quickly recalibrated their price targets on the disappointing news. For example, Jefferies further cut its price target from $140 to $110; Canacord dropped its target from $125 to $110, describing the news as a "gutpunch." Wells Fargo dropped its price target a whopping $45, from $145 to $100, while Truist cut its target from $140 to $105.

162.    On August 30, 2024, in a report entitled "Self-Inflicted Pain, Poor Execution," analysts at Oppenheimer & Co., Inc. remarked:

> Elastic's poor execution surprised us. We're unsure why such material changes were implemented at once, globally, without taking into account the potential impact on sales cycles, deal qualifications, etc. We believe the decisions will raise questions and shake investor confidence, and we expect the shares to remain under pressure until a clearer path in execution is established.

163.    Similarly, a Jefferies analyst report from August 30, 2024 concluded that "the most concerning element of F1Q [fiscal first quarter], in our view, was the lack of communication from ESTC to investors on the significant amount of sales segmentation changes made at the beginning of F1Q (May 1st)."

164.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

165.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of all persons and entities who purchased or otherwise acquired Elastic common stock on the NYSE or another United States trading venue between June 2, 2023 and August 29, 2024, both dates inclusive, and were damaged thereby. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

166.    The members of the Class are so numerous that joinder of all members is impracticable. Elastic had 105,534,887 common shares outstanding and 47 holders of record as of May 31, 2025, representing a far higher number of beneficial owners whose brokers hold their

shares in "street name." Throughout the Class Period, Elastic's common stock actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Elastic or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

167.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

168.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

169.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented or omitted material facts about the business, operations and management of Elastic;

- whether the Individual Defendants were control persons of Elastic during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading statements;

- whether the prices of Elastic's common stock during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

170.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

171.    Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Elastic's common stock traded in an efficient market;

- the Company's shares were liquid and traded with heavy volume during the Class Period;

- the Company traded on the NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

- Plaintiffs and members of the Class purchased, acquired, and/or sold Elastic common stock between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts materialized or began to emerge, without knowledge of the omitted or misrepresented facts.

172.    Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

173.    Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of*

*Utah v. United States*, 406 U.S. 128 (1972), as the claims asserted herein sound primarily in omission rather than affirmative misrepresentation.

## COUNT I

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

174.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

175.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

176.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy, and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices, and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of Elastic common stock. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Elastic common stock; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire Elastic common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each of them, took the actions set forth herein.

177.    Pursuant to the above plan, scheme, conspiracy, and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the materially

misleading statements described above that were designed to influence the market for Elastic common stock. The statements described above were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Elastic's financial results and business prospects.

178.    Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

179.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior executives of Elastic, the Individual Defendants had knowledge of the details of Elastic's internal affairs and operations throughout the Class Period.

180.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of Elastic's public statements. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Elastic's business, operations, financial condition, and prospects. As a result of the dissemination of the aforementioned false and misleading statements, the market price of Elastic common stock was

artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Elastic's business and financial condition which were concealed by Defendants, Plaintiffs and the other members of the Class purchased or otherwise acquired Elastic common stock at artificially inflated prices and relied upon the price of the common stock, the integrity of the market for the common stock and/or upon statements disseminated by Defendants, and were damaged thereby.

181.    Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said common stock, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of Elastic's common stock was substantially lower than the prices paid by Plaintiffs and the other members of the Class. The market price of Elastic common stock declined upon public disclosure or materialization of the concealed risks alleged herein to the injury of Plaintiffs and all other Class members.

182.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

183.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions, and sales of the Company's common stock during the Class Period, upon the disclosure or materialization of the concealed risks on the dates identified in this Amended Complaint.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

184.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

185.    During the Class Period, the Individual Defendants not only participated in but dominated the operation and management of Elastic, and participated, directly and indirectly, in the conduct of Elastic's business affairs. Because of their roles and responsibilities as Elastic's two most senior executives, they knew the adverse non-public information that rendered Elastic's public statements false and misleading.

186.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Elastic's business and results of operations, and to correct promptly any public statements issued by Elastic which had become materially false or misleading.

187.    Because of their positions of control and authority as senior officers, and the fact that they exercised such control in the day-to-day conduct of Elastic's affairs, the Individual Defendants were able to, and did, control the Company's statements which Elastic disseminated in the marketplace during the Class Period concerning Elastic's business, financial results and operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Elastic to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of Elastic within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Elastic common stock.

188.     Each Individual Defendant also culpably participated in the misrepresentations to investors as alleged in Count I. Each of the Individual Defendants, therefore, acted as a controlling person of Elastic. By reason of their senior management positions of Elastic, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Elastic to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Elastic and possessed the power to control the specific activities, which comprise the primary violations about which Plaintiffs, and the other members of the Class complain.

189.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Elastic.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;

B.     Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

Dated:  August 1, 2025

Respectfully submitted,

*/s/ Brian P. O'Connell*

**POMERANTZ LLP**

Joshua B. Silverman
Omar Jafri
Brian P. O'Connell
Diego Martinez-Krippner
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile:  (312) 377-1184
Email: jbsilverman@pomlaw.com
         ojafri@pomlaw.com
         boconnell@pomlaw.com
         dmartinezk@pomlaw.com

Jeremy A. Lieberman
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile:  (212) 661-8665
Email:  jalieberman@pomlaw.com

*Co-Lead Counsel for Plaintiffs and the proposed Class*

**THE LAW OFFICE OF JACOB SABO**
Jacob Sabo
22a Mazzeh Street
Tel-Aviv, Israel
Telephone: (++972) 39070770

*Additional Counsel for Lucid Alternative Fund, LP*

**THE ROSEN LAW FIRM, P.A.**
Jonathan R. Horne, Esq.
Phillip Kim, Esq.
Laurence M. Rosen, Esq.
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile:  (212) 202-3827

68

Email: jhorne@rosenlegal.com
       philkim@rosenlegal.com
       lrosen@rosenlegal.com

***Co-Lead Counsel for Plaintiffs and the
proposed Class***

**SCHALL LAW FIRM**
Brian Schall, Esq.
2049 Century Park East, Suite 2460
Los Angeles, CA 90067
Phone: (310) 301-3335
Fax: (877) 590-0483
Email: brian@schallfirm.com

***Additional Counsel for Jeff Milan***